**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 15 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

      No. 96-2110

SONYA U. CASS,

      Defendant-Appellant.

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR 95-164 LH)**

James T. Martin, U.S. Attorney Office, District of New Mexico, Albuquerque, New Mexico, for the Plaintiff-Appellee.

Judith A. Rosenstein, Office of the Federal Public Defender, Albuquerque, New Mexico, for the Defendant-Appellant.

Before **PORFILIO**, **LOGAN** and **EBEL**, Circuit Judges.

**EBEL**, Circuit Judge.

Sonya Cass was convicted of making a false statement to a federal agent in violation of 18 U.S.C. § 1001. Cass reported that she had been kidnapped and

sexually assaulted, leading the F.B.I. to begin a kidnapping investigation.  In the course of the investigation, the F.B.I. uncovered information causing them to believe that Cass had been with a boyfriend during the time she claimed she was kidnapped.

Cass appeals her conviction, arguing that the district court erred in allowing the government to introduce, over objection, the hearsay statements of Cass' husband, her employer, and F.B.I. agents.  She also alleges error in the admission of hearsay statements that she was involved in extramarital affairs.  We agree with Cass that the complained-of statements are hearsay and that the court erred in admitting them.  However, we conclude that the error was harmless because the government introduced abundant admissible evidence of Cass' guilt.  Therefore, we affirm the defendant's conviction.

Background

Sonya Cass disappeared from her home on July 22, 1994.  The same day, her husband, Kevin Cass, filed a missing persons report.  On July 25, Mr. Cass called 911 to report that his wife had been kidnapped, which caused the F.B.I. to begin a kidnapping investigation.  On July 28, 1994, in a three-way taped phone conversation, Sonya Cass told Kevin Cass and F.B.I. Agent John Andrews that she had been kidnapped from a convenience store in Clovis, New Mexico, and had been transported to Waco, Texas.  Sonya Cass said that a man grabbed her

and forced her to take her car to a mall, where it was left. The kidnapper then covered her face and drove her to Waco, Texas. Cass said she escaped with another kidnap victim by throwing hot grease in the kidnapper's face.

Agent Andrews began investigating the case as a kidnapping, but soon began to suspect that Cass had left New Mexico voluntarily to join her boyfriend Michael Lawrence in Arlington, Texas. After interviewing Cass in Texas, F.B.I. agents there informed her that they did not believe her story. The agents threatened to prosecute her for making a false statement unless she recanted. Cass maintained that she had been kidnapped.

The prosecution's first witness was Agent Andrews. While testifying, he repeated, over hearsay objections,[1] out-of-court statements of Kevin Cass, Sonya Cass' employer, Dallas F.B.I. agents, bank officials, a taxi driver, and the driver of an airport shuttle. The objections were overruled on the grounds that the out-of-court statements were not admitted for the truth of the statements. The government successfully argued that the statements were introduced to show the effect they had on the investigation and to show inconsistencies between the account Cass gave to Texas F.B.I. agents of her whereabouts and the information New Mexico agents had gathered in their investigation. The government argued

---

[1]Although the defense repeatedly objected on hearsay grounds, it failed to object on Confrontation Clause grounds.

that the defense opened the door to such statements by asserting in its opening statement that the F.B.I. failed to conduct a proper kidnapping investigation, and instead conducted an investigation aimed at showing that the allegations of kidnapping were false. Agent Andrews also testified, over hearsay and relevance objections, that prior to her disappearance, Cass was rumored to be involved in extramarital affairs.

**Hearsay Evidence**

Statements by Kevin Cass

Kevin Cass exercised his spousal privilege not to testify. Nevertheless, on the stand, Andrews repeated statements made to him by Mr. Cass, including the statement that shortly after Sonya left the house on July 22 she returned to get her birth and nursing assistant certificates, telling Kevin that she needed the documents for work.

During Andrews' testimony, the government introduced an answering machine tape given to Andrews by Kevin Cass. On the tape, a voice says, "the car is at the mall." Andrews testified that Kevin said the voice on the answering machine was Sonya's, and that after Kevin heard the message he picked up the car at the mall where Sonya normally parked it. Kevin said that he found Sonya's nursing uniform and shoes in the car.

The prosecutor showed Andrews photos taken at an A.T.M. on the morning that Sonya disappeared. Andrews testified that the photos were of a black female who was making a withdrawal of $100 from Sonya and Kevin's account using Sonya Cass' personal identification number at 9:00 a.m. on the morning that Sonya disappeared. Andrews said that Kevin identified Sonya as the woman in the photos, and said that she was not wearing the clothing she had been wearing when she left the house. The photos and the bank records were introduced into evidence later in the trial.

## Statements by Sonya Cass' Employer

No one from Sonya's New Mexico employer was called as a witness. Yet Andrews testified that the employer verified that Sonya did not need her nursing or birth certificate at work, as they were already on file.

## Statements by Dallas F.B.I. Agents

Dallas F.B.I. agents interviewed Sonya immediately after she claimed to have escaped from her abductor. These agents were never called to testify. However, Andrews testified that Sonya told the agents that the kidnapper made her shop for and change into new clothes and that he threw her nurse's uniform out of the window of the car. Andrews testified that Sonya told the agents that she had withdrawn money from an A.T.M. machine at the mall, a different machine than the one indicated by bank records. She also said that after escaping

from her kidnapper she accepted a ride from a stranger to the bus station. Andrews also testified that Sonya never told Dallas agents that she tried to withdraw money from the Lubbock Airport A.T.M., although bank records showed that someone had tried to access her account using her personal identification number at around 1 p.m. on July 22.

Extramarital Affairs Testimony

On cross-examination, Andrews testified that numerous people interviewed by the FBI said that Sonya was having an affair with one man and was seeing other men as well. He testified further that Sonya's mother had said that Sonya may have been seeing two men, including one in Arlington, Texas, and that Sonya had bragged to friends, associates and relatives that she could see other men without getting caught. The court interrupted the testimony, and after a lunch recess, instructed the jury to disregard "the last answer by Agent Andrews," which was the answer that disclosed the information about Sonya's reputation for affairs. The court found that the testimony was not hearsay but that it should have been excluded under Fed. R. Evid. 403 because it was prejudicial.

Admissible Evidence

The government introduced abundant admissible evidence that tended to prove that Sonya's statement to the F.B.I. that she had been kidnapped was false, including the taxi driver's testimony that on July 22, about 9:00 a.m., she drove

Sonya from a mall in Clovis, New Mexico, to a shuttle bus that would take her to the Lubbock Airport. The driver had contacted the police after recognizing Sonya in a missing person's flier circulated by Sonya's family. She testified that she remembered Sonya Cass because Sonya did not have any luggage, which was unusual for someone who was going out of town.

An airport shuttle driver testified that on July 22 he drove two passengers, a black woman without luggage and a woman from Minnesota, from the Holiday Inn in Clovis to the airport in Lubbock. He testified that the shuttle arrived at the Lubbock Airport about 1:20 p.m. Central Time. The driver could not identify Sonya as the woman on the shuttle that morning, but said that he had seen Sonya somewhere before.

Testimony of Michael Lawrence

Michael Lawrence testified that Sonya had been staying with him in Texas from July 22 to July 27. He described first meeting Sonya in a nightclub in Dallas in 1994 and said that they spent the night together. After they met, when Sonya returned to New Mexico, Lawrence testified that they spoke to each other daily over the phone. Lawrence's phone records were introduced; they showed that he had called Sonya as often as four times a day. They also showed collect calls from Sonya to Lawrence. Lawrence testified that Sonya was unhappy in her marriage, and that they had planned for her to leave her husband and move in with

him. He testified that he expected Sonya to arrive on July 4, but she had disappointed him. When she still hadn't arrived on July 20, he told her that he was "tired of waiting" for her and to make up her mind about whether she was coming. She finally arrived on July 22. Lawrence said that he picked her up at the airport and noticed that she did not have any luggage, so that weekend he bought her clothes and toiletries. He also told her how to transfer her nursing license from New Mexico to Texas.

On Monday, July 25, Lawrence went to work at about 6:00 a.m. He returned from work late that evening. He testified that Sonya was the only person in his home that day. Phone records showed a call made from Lawrence's house to the Cass' house at 6:45 a.m. that morning. Police records showed that Kevin Cass had called 911 at 6:50 a.m. that morning to report that his wife had been kidnapped.

Lawrence testified that he was not at home on July 28 at 6:53 a.m. Phone records showed a call from Lawrence's home to the Cass' home on July 28 at 6:53 a.m., the same morning that Sonya called Kevin and told him, in a tape recorded conversation, that she had just escaped from her kidnapper and was at the Arlington, Texas, bus station. On July 29, she called Lawrence and told him that she was returning to Clovis, New Mexico. Lawrence testified that after Sonya

returned to New Mexico she called him and told him that her mother had filed a missing person's report for her during the week that she was staying with him.

Andrews' Opinion Testimony

Andrews testified that in his opinion Cass' version of her abduction was "highly unusual." He said it was unusual for an abductor to take someone to shop for clothes, or to allow a victim access to a weapon such as hot grease. He also said that it would be unusual for a victim to accept a ride from a stranger after being abducted or to split up from a fellow victim before going to the police.

Closing Arguments

In its closing, the government argued that the case was about the lies that Sonya had told the F.B.I., her husband, her family and even her boyfriend. The prosecutor said that Sonya said that she needed her nursing and birth certificates for work--but that she didn't need them for work in New Mexico. She said she was forced to drive to the mall--but her car was found parked where she normally parked it. She told the Dallas F.B.I agents that she used an A.T.M. at a mall where she was forced to buy clothes, but she was seen in photographs using a different A.T.M. She said that her uniform was thrown out of the window of the car. The prosecutor argued from these "facts" that Cass planned to go to Texas and went there voluntarily to be with Michael Lawrence.

Defense counsel objected to the government's references in closing argument to evidence that had not been admitted. The court responded: "The jury will remember what the testimony was."

The Defense

During the government's case-in-chief, the defense tried to impeach the government's witnesses by showing that the taxi driver had little chance to observe Sonya, and that discrepancies existed in the descriptions of Sonya's appearance offered by the taxi driver, the shuttle driver, and Lawrence. The defense also brought out that when the F.B.I. first questioned Lawrence, he told them Sonya had visited him in August or September of 1994. It was only after the F.B.I. showed Lawrence phone records that he agreed that Sonya had arrived in Texas on July 22.

The defense called a Delta Airlines supervisor who had been working at the Lubbock Airport on July 22. She testified that she could not identify Sonya and that Sonya's name did not appear on the passenger manifests for July 22. The defense called a therapist who had seen Sonya a week and a half after she spoke to Dallas F.B.I. agents. The therapist testified that Sonya cried throughout the interview and said that she had been kidnapped and repeatedly raped. She gave her opinion that Sonya was suffering from post-traumatic stress disorder that was consistent with her having experienced a traumatic event. The therapist testified

that if Sonya was lying about the kidnapping she would have presented herself in a different way. In addition, family members testified that Sonya was an honest person. Sonya's cousin, Carla Hollings, testified that Sonya and Kevin were a happy couple. Sonya's medical records were admitted. Although they revealed no physical evidence of sexual assault, she had received a diagnosis of sexual assault.

## DISCUSSION

Evidentiary rulings by the trial court are reviewed for abuse of discretion. United States v. Wilson, 107 F.3d 774, 780 (10th Cir. 1997). We review such rulings by considering the record as a whole. Id.

Hearsay is defined in Fed. R. Evid. 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible at trial, except as provided by the Federal Rules of Evidence or other statutory authority. See Fed. R. Evid. 802.

The government argues that none of the out-of-court statements repeated by Andrews were hearsay because none were admitted to prove the truth of the matters asserted. Rather, they were admitted to show the effect of the statements on the FBI investigation. For example, the government asserts that Kevin Cass' statement to Andrews that his wife called from somewhere in Texas to say that

she had been kidnapped was not introduced to show that Sonya Cass actually called or that she was actually kidnapped, but rather to explain why the FBI began a kidnapping investigation.[2] Similarly, the government asserts that statements made by Texas FBI agents about what Sonya told them were not introduced to prove that Sonya really made the statements or that the statements were true, but only to illustrate that the inconsistencies between the statements and other evidence uncovered by the FBI led the agency to suspect that Sonya was lying and to change the focus of its investigation from a kidnapping investigation to a false statement investigation. The government argues that it was justified in showing this process because the defense asserted in its opening statement that the government did not adequately investigate the case as a kidnapping, but rather, quickly concluded that Sonya was lying.

The government relies on United States v. Freeman, 816 F.2d 558 (10th Cir. 1987), for the proposition that statements offered to explain why a government investigation is undertaken are not hearsay. In Freeman, the defendant was convicted of delivery and possession of counterfeit federal reserve

---

[2]Many of the out-of-court statements complained of in this case are "double hearsay." However, as in this example, the first layer of "hearsay" is often a statement by Sonya Cass, which is a party admission and is not considered hearsay under the Rules. Fed. R. Evid. 801(d)(2)(A). Thus, in this example, defendant's complaint is about the second layer of "hearsay," Kevin Cass' out-of-court statement to Andrews about what Sonya Cass said.

notes. At trial, a Secret Service Agent testified about how the investigation into the defendant's activities had come about. The agent recited that a Kansas City police officer told him he had a reliable source with information about counterfeiters. The agent testified that he met with the informant who named certain counterfeiters other than the defendant and said that those counterfeiters were planning to meet with "an unknown white male" at a certain time for the purpose of passing counterfeit money. The agent set up surveillance of the other counterfeiters and caught them passing the money to Freeman.

Although the defense objected to the introduction of the out-of-court statements of the Kansas City police officer and the informant as hearsay, we affirmed the district court's decision to admit the evidence, holding that "out of court statements are not hearsay when offered for the limited purpose of explaining why a Government investigation was undertaken." 816 F.2d at 563 (emphasis added); see also United States v. Farley, 992 F.2d 1122 (10th Cir. 1993) (out-of-court statements of child sexual abuse victim not hearsay if admitted to show why mother began investigation). This case differs from Freeman and Farley in the number and pervasiveness of out-of-court statements that were allowed and because, in the present case, the government in fact used the testimony as proof of the matters asserted.

Government's Use of Out-of-Court Statements Was Extensive and Prejudicial

In Freeman we held that it was not error to admit the statements but cautioned that "out-of-court statements by informants offered to explain the background of an investigation, like all evidence, must be evaluated under the criteria in Fed.R.Evid.Rules 401 and 403 for relevance and to prevent confusion or prejudice on the part of the jury." 816 F.2d at 563. We found the out-of-court statements in Freeman "neither confusing nor prejudicial" because they contained only a single reference to the defendant. Id. at 564; see also Farley, 992 F.2d at 1125 (one of out-of-court statements of abused child admitted where statement "was clearly not offered for the truth of the matter asserted"). Other cases in which we have allowed such testimony involve the admission of, at most, only a few limited statements, and typically if a hearsay objection was raised the trial court immediately instructed the jury as to the limited use of the evidence. See, e.g., United States v. Barela, 973 F.2d 852, 855 (10th Cir. 1992) (approving use of single out-of-court statement of informant to show why police began investigation); United States v. Bowser, 941 F.2d 1019, 1021 (10th Cir. 1991) (approving use of single out-of-court statement of informant that defendant carried gun, in prosecution for narcotics trafficking, to explain officer's aggressive conduct toward defendant). By contrast, in the present case, scores of out-of-court statements were admitted, many of which contained references to

- 14 -

Sonya, and many such statements were not accompanied by limiting instructions, notwithstanding the defendant's objection.

Courts and commentators have recognized that out-of-court statements should not be admitted to explain why a law enforcement agency began an investigation if the statements present too great a danger of prejudice. See Garrett v. United States, 78 F.3d 1296, 1302-03 (8th Cir.), cert. denied, 117 S. Ct. 374 (1996) (noting, in the context of a conspirator statement, that if the "statement is both permissible background and highly prejudicial, otherwise inadmissible hearsay, fairness demands that the government find a way to get the background into evidence without the hearsay") (internal quotation omitted); United States v. Forrester, 60 F.3d 52, 59 (2d Cir. 1995) ("The government's identification of a relevant non-hearsay use for such evidence, however, is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice.") (internal quotation omitted); United States v. Alonzo, 991 F.2d 1422, 1427 & n.5 (8th Cir. 1993) ("district court must control and limit the use of background hearsay statements as the trial develops" to avoid possible prejudice and because of the "seriously prejudicial" nature of certain background hearsay, the trial court cannot simply rely on cautionary instructions to prevent prejudice). McCormick has criticized the "apparently widespread abuse" of this hearsay exception:

In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received," or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.

2 McCormick on Evidence (4th ed.) § 249, at 104 (citations omitted).

Here, the hearsay problem is exacerbated because the evidence the government presented to "explain the course of its investigation"--Kevin's statements, statements of Dallas F.B.I. agents, statements of Sonya's employer, etc.--go to precisely the issue the government was required to prove--that Sonya lied about being kidnapped. Hearsay evidence that directly goes to guilt is particularly difficult to limit to background purposes. See United States v. Evans, 950 F.2d 187, 191 (5th Cir. 1991) (evidence otherwise admissible as background "becomes inadmissible hearsay if it also points directly at the defendant and his guilt in the crime charged"); United States v. Brown, 767 F.2d 1078, 1084 (4th Cir. 1985) (error to admit out-of-court statements as "background" where statements implicated defendant in charged crime and "effect of the evidence could only have been a substantial bolstering of the government's case by inadmissible hearsay").

The Government in Fact Used Out-of-Court Statements for Their Truth

Although the government's purported use for the statements was to show why the investigation focused on Sonya herself, rather than on an alleged kidnapper, in fact, from the beginning of the trial to the end, the government relied on the out-of-court statements for their truth. For example, in its opening statement, the government said that the jury would learn that the defendant's account of her kidnapping was not true because: "[T]he defendant left for work on that day, July 22, 1994, and took her nursing certificate and birth certificate"; "[i]nstead of withdrawing money from a bank in the mall, she went to an automatic teller machine at another location"; "after the defendant withdrew money, she left a message on her home answering machine for her husband saying, 'The car is at the mall.'" The only evidence admitted at trial to prove those facts, however, was the testimony of Agent Andrews in which he repeated the out-of-court statements of Kevin Cass and Dallas F.B.I. agents.

During its closing argument, the government again referred to Sonya's taking her nursing and birth certificates on the morning of July 22. But no evidence--other than the out-of-court statement of Kevin Cass--was introduced to support that assertion. The government also argued that Sonya lied about the reason for taking the documents, an assertion that could only be maintained if the out-of-court statements of Kevin Cass and Sonya Cass' employer were treated as evidence of the truth of the matters asserted. Moreover, during the trial, Agent

- 17 -

Andrews relied on out-of-court statements of Dallas agents as the basis of his opinion that the kidnapping was unusual. Courts have not hesitated to find error under similar circumstances. See, e.g., United States v. Sallins, 993 F.2d 344 (3d Cir. 1993) (finding out-of-court "background" statements hearsay where government relied on the contents of the statement for their truth during closing argument and where admissible evidence sufficiently established background).

As the government's first witness, Agent Andrews used out-of-court statements to "outline" the entire prosecution case. Police witnesses may not simply repeat on the stand what other witnesses have told them and justify the practice by arguing that the statements are introduced to explain how they went about their investigation. That would be stretching the Freeman rule beyond the breaking point. Freeman allows the out-of-court statements to be admitted for the limited purpose of explaining why an investigation was begun. Here, the government used the out-of-court statements for that purpose, as well as to establish the basis for Andrews' opinion and, in opening statement and closing argument, as proof of the matters asserted.

Perhaps in this case it would have been proper for the government to introduce some limited out-of-court statements to explain why a kidnapping investigation was undertaken and even why the focus of the investigation shifted away from an alleged kidnapper to Sonya herself because the defendant focused

on the nature of the investigation in her defense. See United States v. Reyes, 18 F.3d 65, 71 (2d Cir. 1994) (noting that certain defense tactics might "justify rebuttal through the state of mind evidence" but requiring that such use be limited and redacted to the extent possible and that special precautions be taken to prevent the use of such evidence on the merits of the case). However, here the extensive admission of out-of-court statements, the fact that such evidence went directly to the defendant's guilt, and the use of such evidence to establish the truth of the matters asserted compel the conclusion that such evidence was used for hearsay purposes.[3] Because the use of the evidence was clearly not limited to the reason for which it was admitted, its admission constitutes error.

Harmless Error

A trial court's admission of inadmissible evidence will disturb a defendant's conviction only if the error is not harmless.[4] See Fed. R. Crim. P. 52(a). "[T]he erroneous admission of evidence under a well-established exception to the hearsay rule is harmless unless it had a `substantial influence' on the outcome or

_____

[3]The government argues that the transcript of the Dallas agents' interview with Sonya Cass was admitted into evidence by the defense and thus the government was free to refer to those statements for their truth. In fact, the defense introduced only portions of the transcript, and they apparently did not relate to the out-of-court statements at issue in this appeal.

[4]If an error is not constitutional, we will affirm a conviction as long as the error is harmless. See United States v. Cestnik, 36 F.3d 904, 910 (10th Cir. 1994).

leaves one in `grave doubt' as to whether it had such effect." United States v. Cestnik, 36 F.3d 904, 910 (10th Cir. 1994) (internal quotations omitted).  Thus, the question is whether the admission of the statements substantially influenced the jury's verdict.

Even without the hearsay testimony the government put on a very strong case.  The story told by the admissible evidence--the testimony of Michael Lawrence, the taxi and shuttle drivers, the bank and phone records, the answering machine tape, and the taped phone conversations--was quite damning.  The defense case was weak, consisting primarily of character evidence and testimony that Sonya was suffering from post-traumatic stress disorder consistent with a kidnapping.

Nevertheless, the inquiry is not whether there was enough evidence to convict the defendant without the inadmissible evidence, but whether the inadmissible evidence had a "substantial influence" on the outcome of the trial.  The out-of-court statements of Kevin Cass are particularly troublesome, as they point to planning on Sonya's part.  Nevertheless, given the wealth of evidence put forth by the prosecution, we believe the error was harmless.  However, the fact that it is harmless error in this particular case does not render the conduct any less erroneous, and it is worth repeating again the caution that the use of hearsay evidence to establish background or to establish the investigator's state of mind

presents a situation where "the need for the evidence is slight [and] the likelihood of misuse great." McCormick, supra, § 249, at 104.

Cass also maintains that the admission of hearsay violated her Constitutional rights under the Confrontation Clause. However, because Cass failed to raise this objection at trial we review it under a plain error standard. See United States v. Perez, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc). For the reasons described above, the admission did not constitute plain error.

Extra-Marital Affairs Testimony

The district court realized that it erred in admitting hearsay testimony regarding Cass' extramarital affairs because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403. After a break, the court gave a curative instruction to the jury, directing it to "disregard the last answer," which pertained to the defendant's reputation of extra-marital affairs. On the authority of United States v. Sands, 899 F.2d 912 (10th Cir. 1990), Sonya asks us to find the jury incapable of disregarding the testimony and to reverse. However, in Sands evidence of a defendant's prior criminal convictions came in over the express instructions of the judge that such evidence was not to come in unless the defendant took the stand. Here, the jury properly heard in detail from Michael Lawrence about one of Sonya's affairs. Thus, the possibility of serious prejudice from the admission of the evidence was

less than that faced by the defendant in <u>Sands</u>.  Further, cautionary instructions are ordinarily sufficient to cure any alleged prejudice to the defendant.  <u>See</u> <u>United States v. Peveto</u>, 881 F.2d 844, 859 (10th Cir. 1989).  Given the strength of the prosecution's case as a whole, and the cautionary instruction, we find the error harmless.

Accordingly, we AFFIRM the district court's judgment of conviction.