The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
December 19, 2019

## 2019COA183

**No. 16CA0746, *People v. Bobian* — Evidence — Opinions and
Expert Testimony — Testimony by Experts**

Where a trial court allowed a police detective witness to offer
undisclosed expert testimony about blood residue and tool
markings evidence, a division of the court of appeals holds that the
error was harmless under the circumstances.  The division further
concludes that where the detective served as the prosecution's
advisory witness and testified about the consistency of the
eyewitnesses' trial testimony with their statements just after the
charged incident, any error in admitting the testimony did not
amount to prejudicial plain error that would warrant reversal.  The
division also rejects claims of prosecutorial misconduct.

The special concurrence discusses the propriety of allowing a police detective to testify about the consistency between eyewitnesses' statements at a crime scene and their testimony at trial.

Court of Appeals No. 16CA0746
Adams County District Court No. 15CR1426
Honorable Katherine R. Delgado, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Michael Edward Bobian,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE TERRY
Welling, J., concurs
Berger, J., specially concurs

Announced December 19, 2019

Philip J. Weiser, Attorney General, Patrick A. Withers, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Britta Kruse, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Michael Edward Bobian, appeals the judgment of conviction entered on jury verdicts finding him guilty of attempted second degree murder and first degree assault.  We affirm.

¶ 2     We consider and reject Bobian's arguments that his conviction should be overturned because the trial court erred by

- admitting improper expert testimony about blood residue and tool markings; and

- permitting prosecutorial misconduct.

¶ 3     The special concurrence discusses the propriety of allowing a police detective to testify about the consistency between eyewitnesses' statements at a crime scene and their testimony at trial.

I.     Background

¶ 4     The charges stemmed from an altercation during a party at Stephanie Torres's apartment.  Lindsey Collins, who had been staying with Torres for a few days, called a friend for a ride.  The friend in turn called Bobian and asked him to pick up Collins from Torres's apartment.

¶ 5     Bobian and three of his friends entered Torres's apartment unannounced.  Annoyed by the presence of strangers in her home,

1

Torres became belligerent and told them to leave. A fight then broke out between Torres and Bobian's friends. Torres screamed for the victim, T.H., who was outside. The events that took place next were disputed at trial.

¶ 6     The victim testified that he ran through the front door to Torres's aid, and Bobian preemptively struck him on the head with a hatchet. After a struggle, the victim was able to get control of the hatchet from Bobian, and Bobian and his friends then fled the apartment.

¶ 7     Collins took the stand for the defense and gave a different account. She testified that when the victim ran into the apartment and found Torres being attacked by Bobian's friends, the victim struck Bobian from behind and a second fight broke out. Collins testified that the victim continued to attack Bobian, who was squatting on the ground. At some point, Collins realized that Bobian and the victim were fighting over a hatchet, and that the victim appeared injured.

¶ 8     The jury acquitted Bobian of attempted first degree murder but found him guilty of attempted second degree murder and first degree assault.

## II. Expert Testimony

¶ 9     Bobian contends that the trial court erred by admitting the testimony of the State's lead detective about blood patterns and tool markings without qualifying him as an expert. We conclude that any error was harmless.

### A. Standard of Review and Applicable Law

¶ 10     We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Rains v. Barber*, 2018 CO 61, ¶ 8. We will reverse only if "there is a reasonable probability that [an error] contributed to [the] defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial." *People v. Casias*, 2012 COA 117, ¶ 61.

¶ 11     In determining whether testimony is lay or expert testimony, the court must look to the basis for the opinion. *Venalonzo v. People*, 2017 CO 9, ¶ 23. If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony. *Id.* On the

3

other hand, if the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony. *Id.*

¶ 12 Police officers may testify as lay witnesses based on their perceptions, observations, and experiences. *People v. Veren*, 140 P.3d 131, 137 (Colo. App. 2005). But where an officer's testimony is based on specialized training or education, the officer must be properly qualified as an expert. *Id.*

¶ 13 In *People v. Ramos*, 2017 CO 6, ¶ 9, our supreme court held that an ordinary citizen would not be expected to have the experience, skills, or knowledge to differentiate reliably between cast-off blood and blood transfer.

### B. Additional Facts

¶ 14 Witnesses for both the State and the defense testified that they saw the victim throw the hatchet at the front door just as it closed after Bobian exited. The victim, however, could not recall throwing the hatchet.

¶ 15 Lead Detective Frederick Longobricco was the prosecution's advisory witness and was present throughout trial. He testified regarding the blood and tool markings he saw on the front door, as

well as the damage to the wall that was allegedly caused during the altercation. He had the following exchange with the prosecutor about blood patterns:

> Q: [T]here's actually kind of a description for what blood looks like when it's hit against the door like that. What's that kind of blood called?
>
> A: I have received training in blood pattern analysis and depending on how blood strikes an object it will tell you —

¶ 16     At that point, defense counsel objected to the testimony as expert testimony. After the prosecutor responded that the detective was just describing what he had done as a "regular police officer," the court overruled the objection and Detective Longobricco testified as follows:

> A: So when blood strikes a surface, how that blood reacts to the surface will tell you most likely how that . . . blood traveled. So in here when you see a close[-]up of it, the blood showed patterns of coming down, striking down.
>
> Q: Okay. And is that called cast[-]off?
>
> A: Yes.
>
> Q: Also there's kind of a hole back there by — behind the kitchen or behind the table there

5

[and] you also took note of that as well, didn't you?

A:  Correct.  There's an indentation or a hole in the wall, in the drywall.  And there appears to be blood next to it.  The blood next to it appears to be a smear of some sort.  That means that blood was on an object, came in contact with another object.  It didn't actually travel through the air.  We didn't know why that hole in the wall was there.  That was one of the discussions I had with [another officer]. . . .

. . . .

Q:  [L]ooking at [exhibit] 27, [i]s this again kind of the pattern that you're talking about here with the door?

A:  Correct.  This is the slit that we see.  We believed that was connected to the incident.  And then the cast[-]off blood pattern as it travels down, you can see a thinner tail at the top — or a thinner [tail] on one side of it and a deeper or more large base on the end. . . .

. . . .

Q:  And you're noting there both this kind of pattern of dashes straight down in the line in the left that's seemed to being marked nick marks [sic] almost from something hitting it; is that right?

A:  Correct.  They were consistent with something striking . . . the door.

¶ 17    Detective Longobricco described the marks on the door:

6

A: This is the slit mark or the indentation at the top. This became my concern because I wanted to know if that was consistent with the stories that we were hearing in the interviews.

Q: And that's the story that [Torres] said of [the victim] hitting the hatchet against the door?

A: Correct. I wanted to look at this and document it to see if it was consistent with a hatchet strike.

Q: Did you end up doing that?

A: Based on just the — my response as a police officer, I believed that it was consistent due to the width, the depth and the height was consistent [sic]. If somebody hit it with a sledge hammer . . . .

¶ 18　At this point, defense counsel moved to strike this testimony as expert testimony, but the court overruled the objection. The detective then testified, "So if somebody hit it with a hammer or sledge hammer, it would leave a different type of mark, not a thin mark."

## C.　Discussion

¶ 19　Bobian contends that Detective Longobricco's testimony about blood patterns and tool markings amounted to improper expert

7

testimony. Though we agree that it was expert testimony and was improperly admitted, we conclude that the error was harmless.

¶ 20     The detective's reference to the blood evidence as "cast-off" required specialized knowledge that an ordinary person would not have, and he purported to rely on his training in blood pattern analysis. *See Ramos*, ¶ 9 (stating that an ordinary person without the testifying officer's nineteen years of experience would not have been able to provide testimony distinguishing cast-off blood from blood transfer). Detective Longobricco's testimony on this issue was therefore expert testimony, and the court erred by admitting his opinions about how the blood got onto the surface of the door, whether it was "cast-off" blood or a "smear" of blood, and how the blood traveled when it hit the surface. *See id.* at ¶ 10 (a police detective's testimony using technical terms — "spatter" versus "cast-off" — in describing blood was improper expert testimony requiring specialized knowledge "to 'assist the trier of fact to understand the evidence or determine a fact in issue.'" (quoting CRE 702)).

¶ 21     Bobian contends that this error improperly conferred the "aura of expertise" on Detective Longobricco's testimony without requiring

8

the prosecution to qualify him as an expert witness. According to Bobian, this testimony bolstered the prosecution witnesses' account of the incident that Bobian had unexpectedly attacked the victim with a hatchet the moment the victim walked through the door. He also asserts that the blood on the door could have been used to refute the defense theory that the victim was hit in the kitchen, where — according to Collins — the altercation occurred.

¶ 22     The error in admitting this testimony was harmless. There was no dispute that Bobian struck the victim with the hatchet; the only dispute was whether he did so in self-defense. The pattern of blood on the door did nothing to answer that question. Even Bobian's witness (Collins) testified that when the fight between the victim and Bobian moved closer to the front door, "that's when we see the blood." So, the presence of blood on the door did not assist the jury in determining which party's version of events — the State's or Bobian's — was true.

¶ 23     This circumstance distinguishes the case from *Ramos* precisely because the blood patterns in *Ramos* were critical to how the defendant's blood in that case got on the clothing of the victim. The *Ramos* victim testified that the defendant's blood got on her

9

clothing when he punched her, and this contrasted with the defendant's testimony that the blood came from his injured, bleeding hand when he waved his hand around. *Id.* at ¶ 2.

¶ 24 In *Ramos*, a detective testified that some of the defendant's blood got onto the victim's clothing from "transfer" (i.e., physical contact), and not as "cast-off" blood (i.e., from the defendant waving his hand around). *Id.* at ¶ 3. The detective there "opined that the blood on the victim's hat was the result of physical contact and that the bloodied area 'could be' roughly the area of a fist." *Id.* at ¶ 9. The supreme court reversed the conviction because "an ordinary citizen . . . would not have been able to provide the same conclusions." *Id.* Thus, the distinction between "cast-off" and "spatter" blood would have made a difference in how the jury evaluated whether the defendant in *Ramos* struck the victim, as the prosecution asserted.

¶ 25 Not so here, because it is undisputed that Bobian struck the victim with the hatchet. We conclude that the admission of the blood pattern testimony was therefore harmless.

¶ 26 Detective Longobricco's testimony that he looked at the marks on the apartment door to see if they matched the witnesses'

10

statements was also harmless because it did not aid in proving or disproving self-defense. Instead, the testimony went only to whether the victim at some point hit the apartment door with the hatchet — a matter of no consequence to the self-defense issue.

¶ 27    Moreover, the prosecutor did not refer to Detective Longobricco's blood or tool markings testimony in closing argument. Based on the circumstances of this case, we conclude that any error in admitting this testimony could not have affected the outcome of the trial. *See Krutsinger v. People*, 219 P.3d 1054, 1063 (Colo. 2009) (harmless error found where trial court's error "did not substantially influence the verdict or affect the fairness of the trial proceedings").

### III.    Prosecutorial Misconduct

¶ 28    Bobian next contends that multiple incidents of prosecutorial misconduct warrant reversal. We disagree.

### A.    Standard of Review and Applicable Law

¶ 29    In evaluating a claim of prosecutorial misconduct, we first determine whether the conduct in question was improper based on the totality of the circumstances and, if so, we then determine

whether such actions warrant reversal under the proper standard of review. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 30　　Where, as here, a defendant does not object to the challenged conduct at trial, we review a prosecutorial misconduct claim for plain error. *People v. Rhea*, 2014 COA 60, ¶ 43. Plain error is obvious and substantial error that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Hagos v. People*, 2012 CO 63, ¶ 14. To rise to the level of plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper. *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd*, 119 P.3d 1073 (Colo. 2005).

¶ 31　　Prosecutors have a heightened ethical responsibility as compared with other lawyers. *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). "[I]t is improper for a prosecutor[,] knowingly and for the purpose of bringing inadmissible matter to the jury's attention[,] to ask a question which he knows will elicit an inadmissible answer." *People v. Oliver*, 745 P.2d 222, 228 (Colo. 1987).

¶ 32    Although a prosecutor, during closing argument, "has wide latitude and may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence," *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006), the prosecutor may not misstate the law, use arguments calculated to inflame the passions and prejudices of the jury, *People v. Samson*, 2012 COA 167, ¶ 32, or express a personal opinion on the truth or falsity of witness testimony, *Wilson v. People*, 743 P.2d 415, 419 (Colo. 1987).

## B.    Discussion

¶ 33    Bobian contends that the prosecutor intentionally elicited inadmissible testimony while questioning Detective Longobricco and that certain arguments and statements made during closing argument amounted to prosecutorial misconduct.

¶ 34    After reviewing the record, we see no error that would warrant reversal as to the following instances raised by Bobian:

- The prosecutor eliciting expert testimony from Detective Longobricco.  We have concluded that the error in admitting this testimony was harmless, and we see no prejudicial error

13

arising from the prosecutor's questioning that elicited the testimony. *See Hagos,* ¶ 14.

- The prosecutor asking Detective Longobricco to opine on whether the prosecution witnesses' testimony was consistent with the statements they gave on the night of the incident, and whether the witnesses' statements were consistent with each other. Even assuming that the prosecutor's question in this regard was improper, we conclude that it did not rise to the level of plain error. First, the question was not "flagrant or glaringly or tremendously improper," and thus did not constitute plain error. *People v. McMinn,* 2013 COA 94, ¶ 58. Second, the detective did not testify about whether the witnesses had testified truthfully. *See Venalonzo,* ¶ 32 (witnesses are prohibited from testifying that another witness was telling the truth on a particular occasion). And third, Detective Longobricco's equivocal response mitigated any prejudice. When asked whether the witnesses' testimony was consistent with their statements on the night of the incident, the detective answered, "For the most part, yeah." We conclude that this answer did not so undermine the

14

fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *See Hagos*, ¶ 14.

- The prosecutor advising the jury during closing argument that it should consider the greater offenses before considering the lesser included offenses. True, Colorado is a "soft transition" jurisdiction, in which the jury need not unanimously acquit the defendant of the greater offense before considering the lesser included offenses. *People v. LePage*, 397 P.3d 1074, 1077 (Colo. App. 2011), *aff'd on other grounds*, 2014 CO 3. But the prosecutor did not suggest that the jury had to acquit Bobian of the greater offenses before considering lesser offenses, and therefore did not misstate the law. *See People v. Padilla*, 638 P.2d 15, 17-18 (Colo. 1981) (finding no plain error in giving stock jury instruction on consideration of lesser included offense if jury did not find the defendant guilty of the charged offense, and stating, "it is not clear from the language of the instruction that the jurors would feel compelled to reach a unanimous decision on the greater offense before considering the lesser included offenses").

- The prosecutor stating during closing argument that "the actions of bringing a weapon into a fist fight are inherently not reasonable no matter what." When considered in context, this isolated comment does not portray a categorical exception to the degree of force that may be used in self-defense. The comment was inartful but permissible commentary on the evidence in this case and the State's assertion of the unreasonableness of Bobian's actions. *See People v. Avila,* 944 P.2d 673, 676 (Colo. App. 1997) ("A reviewing court should examine alleged improper argument in the context of the prosecution's closing argument as a whole."); *see also People v. Strock,* 252 P.3d 1148, 1153 (Colo. App. 2010) (a prosecutor in closing argument may ordinarily use rhetorical devices and a reviewing court considers the frequency of alleged misconduct).
- The prosecutor stating during closing argument, "How do we know [Bobian is] the one who is not acting reasonably? Because he's not sitting over there right now with a giant scalp laceration to the top of his head." This comment related to the

16

proportionality of Bobian's physical response to what he claimed was a threat, and it was not improper.

- The prosecutor questioning Collins's credibility during closing argument by referencing "the one true thing [Collins] said when she was sitting [on] that stand . . . ," and "[h]er story that she came up with yesterday, . . . while [she was] sitting up there on the stand, that was kind of all brand new and we didn't hear that at all through any of the officers, or anybody else . . . ." We disagree that these statements amounted to an expression of the prosecutor's personal opinion of witness credibility. *See Domingo-Gomez*, 125 P.3d at 1051 ("[C]ounsel may properly argue from reasonable inferences anchored in the facts in evidence about the truthfulness of a witness' testimony."); *see also United States v. Spain*, 536 F.2d 170, 174 (7th Cir. 1976) (where conflicts in the evidence exist and cannot be the result of honest mistake, each counsel is "entitled to argue that witnesses called by him had spoken the truth and those called by the other side had testified falsely").

- The prosecutor commenting on the credibility of the State's version of events by stating, "I apologize for the fact that I put

17

up witness after witness who told you the same exact version of basically these events, right?" and "[t]he officers tell you basically the same version of events, as well." These statements were not expressions of the prosecutor's personal opinion of the credibility of the witnesses but were proper statements on the consistency of the evidence. *See Domingo-Gomez*, 125 P.3d at 1051-55.

- The prosecutor referring to Collins as "the homeless hero" and a "squatter with a heart of gold" during his closing argument. While these comments were unnecessary characterizations of the defense witness, they would not have led the jury to decide on an improper basis and do not rise to the level of prosecutorial misconduct. *Cf. People v. McBride*, 228 P.3d 216 (Colo. App. 2009) (reviewing courts accord prosecutors the benefit of the doubt where remarks are simply inartful).

IV.   Cumulative Error

¶ 35    Finally, Bobian argues that the trial court's combined errors amounted to cumulative error. We have concluded that the error in admitting the blood pattern and tool marking testimony was harmless. And even assuming that the prosecutor's question about

18

the consistency of certain witnesses' statements was also improper, we still conclude that the cumulative effect of the errors does not require reversal. We reach this conclusion because, as discussed above, the blood spatter and tool marking testimony did not relate to a material disputed issue, and the question about whether the witnesses' trial testimony was consistent with their earlier statements elicited only an equivocal response. Moreover, the asserted errors would not have had a cumulative prejudicial effect on "the fairness of the trial proceedings [or] the integrity of the fact-finding process"; therefore, reversal is not warranted based on cumulative error. *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting *People v. Lucero*, 200 Colo. 335, 344, 615 P.2d 660, 666 (1980)).

## V. Conclusion

¶ 36 The judgment of conviction is affirmed.

JUDGE WELLING concurs.

JUDGE BERGER specially concurs.

JUDGE BERGER, specially concurring.

¶ 37   Is it permissible for a prosecutor to ask a police detective to testify at a criminal trial that the victim's (or another witness's) testimony and prior statements were consistent?  The majority assumes, without deciding, that such testimony is impermissible. I think the question needs to be decided.

¶ 38   I begin with the black letter rule.  "[N]either lay nor expert witnesses may give opinion testimony that another witness was telling the truth on a specific occasion." *People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009).  This prohibition extends, for example, to comments on a witness's sincerity, *People v. Eppens*, 979 P.2d 14, 17 (Colo. 1999); believability, *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo. 1989); or predisposition to fabricating allegations, *People v. Snook*, 745 P.2d 647, 649 (Colo. 1987).  Further, the supreme court has "held that prosecutorial use of the word 'lie' and the various forms of 'lie' are categorically improper." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 39   It is no answer that the detective's opinion may have made it easier for the jury to determine whether the statements and testimony were consistent.  One of the jury's fundamental tasks is

to consider all of the testimony and to determine which version of the material events is more credible. COLJI-Crim. E:05 (2018). The jury heard all the out-of-court statements and the testimony, so comments on the consistency of that evidence did not provide the jury with any information beyond what it already had. Simply put, a jury does not need help determining whether statements were consistent, particularly from a witness who is obviously aligned with the prosecution. *See People v. McFee*, 2016 COA 97, ¶ 76 (reasoning that detective's opinion could not have been helpful because it was based on the same information the jury had). The admissibility inquiry should end there. *See* CRE 701 (limiting lay opinions to those that are helpful to the jury); CRE 702 (limiting expert opinions to those that assist the trier of fact).

¶ 40     But there is a stronger reason to reject such opinions. They invariably constitute an indirect opinion on the credibility of the witness. The supreme court has made clear that indirect opinions on another witness's credibility are subject to the same exclusionary rules as direct opinions. *Venalonzo v. People*, 2017 CO 9, ¶ 32.

¶ 41    The detective's opinion regarding consistency was, in effect, nothing less than the detective telling the jury that the witness was truthful in her accounts of the relevant events. The Attorney General has not explained, and I cannot discern, any other probative purpose for this opinion testimony.

¶ 42    Moreover, the circumstances surrounding this testimony are more egregious than an off-the-cuff opinion regarding the credibility of another witness. Here, the detective expressing the opinion was the prosecution's advisory witness in a case in which all other witnesses had been sequestered under CRE 615. This detective was the only witness in the entire case who was permitted to remain in the courtroom during the testimony of other witnesses. The prosecution leveraged this privilege (the purpose of which has nothing whatsoever to do with the giving of such opinions) to provide these prohibited opinions.

¶ 43    In reaching my conclusions, I recognize that at least one division of this court has taken a different path. In *People v. West*, 2019 COA 131, ¶ 37, a detective testified that the timing of text messages between the victim and the defendant was "consistent with" other portions of the victim's testimony and the police contact

with the victim and her mother. The detective also testified that events recited by the defendant in his text messages were "consistent with" other sources of information, including police records and the victim's mother. *Id.*

¶ 44     In rejecting, on plain error review, the defendant's argument that this testimony was improperly admitted, the *West* division reasoned that "the detective said nothing about the truth of testimony; instead the detective indicated only that certain statements did not conflict with other statements or evidence." *Id.* at ¶ 43.

¶ 45     This analysis conflicts with the Colorado Supreme Court's teachings that witnesses may not directly or indirectly testify about the truthfulness of another witness. *See Wittrein*, 221 P.3d at 1081. Instead, I agree with the courts in other jurisdictions that have prohibited such opinion testimony.

¶ 46     In *Dickerson v. Commonwealth*, 174 S.W.3d 451, 472 (Ky. 2005), the Kentucky Supreme Court held that it is improper for a witness to testify that another witness has made consistent statements, absent an express or implied charge of recent fabrication or improper influence. The court reasoned:

23

> We perceive no conceptual distinction between testimony that repeats the witness's prior consistent statement verbatim and testimony that the witness previously made statements that were consistent with her trial testimony. Either way, the evidence is offered to prove that the declarant's trial testimony is truthful because it is consistent with her prior statements.

*Id.*

¶ 47    In *State v. McKerley*, 725 S.E.2d 139, 142 (S.C. Ct. App. 2012), a forensic interviewer was permitted to testify that, "in forming her 'opinion as to whether . . . something happened,' she considered whether the victim's statements were 'consistent with the other information'" she had on the case. Although the Court of Appeals of South Carolina acknowledged that the forensic interviewer never testified directly that she believed what the victim had stated, the court nevertheless concluded that "there is no way to interpret [the interviewer's] testimony other than as her opinion that the victim was telling the truth." *Id.*

¶ 48    Similarly, in *State v. Jennings*, 716 S.E.2d 91, 94 (S.C. 2011), the trial court permitted the State to introduce written reports of the forensic interviewer in which the interviewer stated that the "children provided 'a compelling disclosure of abuse' and provided

details consistent with the background information received from mother, the police report, and the other two children." The South Carolina Supreme Court concluded that "[t]here is no other way to interpret the language used in the reports other than to mean the forensic interviewer believed the children were being truthful." *Id.* Accordingly, the court held the admission of the reports was error. *Id.*

¶ 49     In my view, these cases were correctly decided and weigh heavily against a conclusion that *West* was correctly decided.[1] Accordingly, I would hold that a police officer may not testify that the victim's (or another witness's) testimony and prior statements were consistent.

---

[1] A similar issue was addressed by the United States Court of Appeals for the Tenth Circuit in *United States v. Toledo*, 985 F.2d 1462 (10th Cir. 1993). In a kidnapping case, the court addressed a psychiatrist's testimony concerning the mental state of the victim. The psychiatrist opined that the victim's "consistency in reporting the nature of her abduction, being taken against her free will at a train station [and other facts] . . . were *consistent with a high likelihood that [the kidnapping] occurred.*" *Id.* at 1469. The Tenth Circuit held that it was not plain error to allow the testimony but noted that the admissibility of this kind of opinion presented a "close question." *Id.* at 1470.

¶ 50     I recognize that under some circumstances, a police officer's

belief regarding the consistency or inconsistency of a witness's prior

statements (or even the officer's belief that the person was or was

not telling the truth) might be relevant and admissible when the

course of the police investigation is legitimately at issue. *See, e.g.*,

*Davis v. People*, 2013 CO 57, ¶ 19; *People v. Robles-Sierra*, 2018

COA 28, ¶ 26.

¶ 51     But caution is warranted. The Tenth Circuit has analyzed

when the course-of-investigation exception is properly invoked.

*United States v. Cass*, 127 F.3d 1218 (10th Cir. 1997). While

acknowledging that the exception can allow for the admission of

otherwise inadmissible evidence, the Tenth Circuit observed that

"[c]ourts and commentators have recognized that out-of-court

statements should not be admitted to explain why a law

enforcement agency began an investigation if the statements

present too great a danger of prejudice." *Id.* at 1223.

¶ 52     *McCormick on Evidence* rightly criticized the "apparently

widespread abuse" of this exception:

> In criminal cases, an arresting or investigating
> officer should not be put in the false position
> of seeming just to have happened upon the

scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received," or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.

2 *McCormick on Evidence* § 249, at 104 (John W. Strong ed., 4th ed. 1992) (footnotes omitted), *quoted in Cass*, 127 F.3d at 1223.

¶ 53    Given this likelihood of misuse, the exception should only apply when the course of the police investigation is relevant at trial. Even then, a trial court must exercise sound discretion to limit such otherwise inadmissible evidence solely to the purposes underlying the course-of-investigation exception.

¶ 54    For these reasons, I reject the Attorney General's argument that the detective's testimony "could be read" as permissible testimony about the course of the investigation. The Attorney General does not explain, and I cannot discern, how the course of the investigation was relevant or at issue. And, as discussed, the detective's opinion testimony concerned the credibility of other

witnesses, not the detective's investigation. Therefore, the admission of the detective's opinion that the victim's prior statements and testimony were consistent constitutes error.

¶ 55   Nevertheless, I agree with the majority that, as presented to us, the prosecutor's elicitation of the detective's opinion does not justify reversal under the plain error standard. While evidentiary error occurred, Bobian presents this as a matter of prosecutorial misconduct. The prosecutor's elicitation of this opinion evidence was not "flagrant or glaringly or tremendously improper," *People v. McMinn*, 2013 COA 94, ¶ 58, so reversal is not warranted. In light of *West*, the error was not plain under this standard.