The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
March 19, 2020

## 2020COA42

**No. 17CA1536, *People v. Vialpando* — Constitutional Law —
Sixth Amendment — Right to Trial by Jury; Criminal Law —
Prosecutorial Misconduct**

A division of the court of appeals considers whether a

prosecutor's statements during closing argument that the

defendant's "flight continues up to this moment" and that her "flight

has continued up and to this point" were prosecutorial misconduct.

The majority concludes that those comments constituted

prosecutorial misconduct, and further, that this misconduct

requires reversal under the plain error standard.

The majority also concludes that the prosecutor's comments

on the defendant's flight in combination with four other instances of

prosecutorial misconduct and one evidentiary error deprived the

defendant of her right to a fair trial under the cumulative error doctrine.  Thus, the defendant's convictions are reversed.

The dissent concurs with the majority's analysis regarding sufficiency of the evidence, suppression of an out-of-court identification, and the trial court's reasonable doubt illustration, but concludes that the prosecutor's misconduct did not constitute plain error and would therefore affirm the judgment of conviction.

COLORADO COURT OF APPEALS     **2020COA42**

Court of Appeals No. 17CA1536
Adams County District Court No. 16CR150
Honorable Sharon Holbrook, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Yolanda Ursula Vialpando,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE BERGER
Lipinsky, J., concurs
Fox, J., concurs in part and dissents in part

Announced March 19, 2020

Philip J. Weiser, Attorney General, Elizabeth Ford Milani, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Chelsea E. Mowrer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Yolanda Ursula Vialpando exercised her right to a trial by jury. That jury convicted her of aggravated motor vehicle theft and other crimes. During closing arguments, the prosecutor told the jury that Vialpando's "flight continues to this moment," and that her "flight has continued up and to this point." These comments punished Vialpando for exercising her constitutional right to a jury trial. This was plain error, requiring reversal of her convictions.

¶ 2     Moreover, this error and five other errors that occurred over the course of Vialpando's short three-day trial deprived her of her right to a fair trial under the cumulative error doctrine.

I.     Relevant Facts and Procedural History

¶ 3     J.A.'s car was stolen from her Denver home.

¶ 4     Eleven days later, around five p.m., two police officers were sitting in their police vehicle in the parking lot of a motel. One of the officers testified that he saw a car, which would later be identified as J.A.'s, drive around the corner of the motel, reverse over a curb, and turn around to exit the motel parking lot. As the officers followed the car, they learned it was stolen. The officer who was driving testified that he activated his emergency lights to make a traffic stop, but that the car "increased its speed." The officer said

1

that he did not pursue the car because of the police's pursuit policy. Shortly after deactivating his lights, the officer "heard a loud bang" and later saw that the stolen car had crashed. Several witnesses told the officers that they saw a male and female flee the car after the crash.

¶ 5    One of the witnesses was R.H. She was in her car, stopped at a traffic light, when she saw the stolen car crash into another, injuring the other driver. After the crash, R.H. watched a man leave the passenger side and a woman exit the driver's side of the stolen car. They ran away in different directions. R.H.'s car was two lanes away from the crash.

¶ 6    After the crash, the police found a purse in J.A.'s stolen car that contained Vialpando's identification card, credit card, medical insurance card, and "miscellaneous female clothing," which Vialpando identified at trial as her clothes.

¶ 7    Based on the items found in the crashed car, the police began investigating Vialpando. Two officers went to R.H.'s home for an out-of-court identification. One of the officers testified that he showed R.H. a series of photographs, and R.H. identified Vialpando's photo thirty seconds later.

2

¶ 8     Vialpando was charged with vehicular assault, § 18-3-205(1)(a), C.R.S. 2019; vehicular eluding, § 18-9-116.5, C.R.S. 2019; aggravated motor vehicle theft in the first degree, § 18-4-409(2), C.R.S. 2019; and driving under restraint, § 42-2-138(1)(a), C.R.S. 2019.

¶ 9     At trial, R.H. testified that the fleeing woman was "lighter skinned" and had a lot of makeup on.  R.H. testified further that, at the time of the crash, the woman was wearing a black and white striped shirt and skinny black jeans; was in her twenties or thirties; was slender; had black, wavy, long hair; and was maybe about 5 feet 5 inches or 5 feet 6 inches tall.  According to R.H., the woman's makeup "made her look younger."

¶ 10    An officer testified that some of Vialpando's Facebook photos showed her with long black hair and wearing "a significant amount of makeup," and that she appeared younger than she did at trial. He also told the jury that Vialpando's Division of Motor Vehicles record stated that she was 5 feet 5 inches tall, 155 pounds, with brown hair and brown eyes, and her Colorado identification photograph depicted her with "long dark hair."

¶ 11    R.H. explained that, during the out-of-court identification, she told the officers that several of the women "were definitely not the person, and one . . . could be." She told the jury that she selected Vialpando's photo from the lineup and told police that "it could totally be possible" that she was the woman R.H. saw exit the crashed car. R.H. was "seventy-five percent" certain. When asked for an in-court identification, R.H. said that Vialpando "could be" the woman who had fled the stolen, crashed vehicle.

¶ 12    Vialpando explained to the jury that she was robbed of the personal items that were found in the stolen car — including her identification card, purse, insurance card, credit card, and clothing. In fact, Vialpando reported the robbery the day before the car chase and crash occurred. Testimony from a police officer supported Vialpando's account; the officer testified that Vialpando came to the Denver police station the day before the car chase to report that she was robbed at gunpoint, and that several personal items had been stolen.

¶ 13    Vialpando was found guilty as charged and sentenced to four years in community corrections.

II.    Analysis

On appeal, Vialpando asserts six claims of error:

- there was insufficient evidence to support her convictions;

- the prosecutor engaged in seventeen instances of prosecutorial misconduct;

- the lead investigating police officer impermissibly testified that she was the "primary suspect";

- the cumulative effect of the errors deprived her of a fair trial;

- R.H.'s identification was unreliable, so it should have been suppressed; and

- the trial court lowered the State's burden of proof when it used analogies to describe reasonable doubt.

### A.    Sufficiency of the Evidence

We first address Vialpando's sufficiency of the evidence arguments because a reversal due to insufficient evidence "may preclude retrial" on double jeopardy grounds. *People v. Coahran*, 2019 COA 6, ¶ 40 (quoting *People v. Marciano*, 2014 COA 92M-2, ¶ 42).

¶ 16    Vialpando claims that there is insufficient evidence to support her convictions because the prosecution failed to prove identity. She also claims that there is insufficient evidence to support her aggravated motor vehicle theft conviction because the prosecution failed to prove that she knowingly obtained or exercised control over the motor vehicle of another without authorization, or that she obtained or exercised control over the vehicle by threat or deception. Both of Vialpando's sufficiency of the evidence arguments are disproved by the record.

### 1.    The Law

¶ 17    The Attorney General disputes that Vialpando fully preserved her sufficiency of the evidence claims for appeal. But we review the sufficiency of the evidence de novo, including sufficiency claims raised for the first time on appeal, *Maestas v. People,* 2019 CO 45, ¶ 13, to determine whether the evidence at trial was sufficient "in quantity and quality to sustain the defendant's conviction." *Clark v. People,* 232 P.3d 1287, 1291 (Colo. 2010).

¶ 18    The Due Process Clauses of the United States and Colorado Constitutions require proof of guilt beyond a reasonable doubt on every element of a crime. *People v. Marko,* 2015 COA 139, ¶ 233,

6

*aff'd*, 2018 CO 97.  To resolve Vialpando's sufficiency challenge, we must determine whether the direct and circumstantial evidence, when viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable fact finder that Vialpando is guilty of the crimes charged beyond a reasonable doubt.  *Clark*, 232 P.3d at 1291.

¶ 19    "We do not sit as a thirteenth juror to determine the weight of the evidence presented to the jury."  *Id.* at 1293.  Instead, we must give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence, and we recognize that (1) the jury alone resolves the difficult questions of witness credibility and the weight to be given to conflicting items of evidence; (2) the jury is not required to accept or reject a witness's testimony in its entirety; (3) an actor's state of mind is not normally subject to direct proof and must be inferred from her actions and surrounding circumstances; and (4) if there is evidence on which to reasonably infer an element of the crime, the evidence is sufficient to sustain that element.  *People v. Kessler*, 2018 COA 60, ¶ 12.

¶ 20    As relevant here, a person commits aggravated motor vehicle theft in the first degree if she "knowingly obtains or exercises

7

control over the motor vehicle of another without authorization or by threat or deception" and one of eight specified aggravating factors is shown. § 18-4-409(2). Vialpando was charged with committing three of the aggravating factors: (1) using a motor vehicle in the "commission of a crime other than a traffic offense"; (2) causing "five hundred dollars or more [in] property damage"; and (3) causing "bodily injury to another person" while exercising control of the motor vehicle." § 18-4-409(2)(d)–(f). "The critical inquiry is whether the defendant exercised dominion over a vehicle in a manner inconsistent with [her] authority." *People v. Harper*, 205 P.3d 452, 455 (Colo. App. 2008).

¶ 21    To commit aggravated motor vehicle theft, a person must knowingly steal a motor vehicle and use it in the commission of a crime, "regardless of the mens rea associated with the particular crime committed." *People v. Marquez*, 107 P.3d 993, 997–98 (Colo. App. 2004). The culpable mental state "knowingly" applies to the defendant's exercise of control over the vehicle and her awareness of lack of authority. *People v. Stellabotte*, 2016 COA 106, ¶ 20, *aff'd*, 2018 CO 66. A person acts "knowingly"

8

with respect to conduct or to a circumstance described by a statute defining an offense when [s]he is aware that h[er] conduct is of such nature or that such circumstance exists. A person acts "knowingly" . . . with respect to a result of h[er] conduct, when [s]he is aware that h[er] conduct is practically certain to cause the result.

§ 18-1-501(6), C.R.S. 2019.

### 2. Application

¶ 22    Giving the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence, we conclude that there is sufficient evidence in the record to allow a reasonable fact finder to convict Vialpando of the crimes charged.

¶ 23    Vialpando argues that there was insufficient evidence to prove the charged offenses because the prosecution did not prove identity — that she was the one who committed the charged crimes. Specifically, she relies on the fact that J.A. never saw who stole her car, only R.H. identified her as the woman fleeing from the crashed vehicle, and R.H.'s initial description of the perpetrator did not match Vialpando's appearance in every respect because Vialpando

9

was not in her twenties or thirties, nor did she have long, dark hair.[1]

¶ 24    But a jury could reasonably infer that Vialpando was the person who committed the crimes because (1) J.A. testified that her vehicle was taken without her consent; (2) R.H. told the jury that she saw a woman flee — whom she later identified as Vialpando — from the driver's side of J.A.'s stolen vehicle; (3) police officers testified that the driver of J.A.'s stolen vehicle fled the motel parking lot and sped up, rather than pulling over, after the police activated their lights; and (4) Vialpando's identification card and other belongings were found in J.A.'s stolen vehicle. *See People v. Clay*, 644 P.2d 81, 82 (Colo. App. 1982) ("A jury can draw reasonable inferences that arise from the facts of the case.").

¶ 25    In sum, the evidence was sufficient for the jury to conclude that Vialpando was driving J.A.'s stolen car, and that Vialpando did not have authority to do so. *Harper*, 205 P.3d at 455–56.

¶ 26    While Vialpando testified that her belongings had been stolen and that she was at the hospital with her mother on December 30,

---

[1] At trial, Vialpando had short hair. She testified that she lost her hair in 2010 because she suffered from lupus.

2015, the jury could, and evidently did, reject her testimony. *See Kessler*, ¶ 12.

¶ 27    Nor can we conclude that the prosecution presented insufficient evidence that Vialpando knowingly lacked authority to exercise control over J.A.'s car. Vialpando relies on the fact that J.A. did not see who stole her car. However, evidence was presented that the driver of J.A.'s stolen vehicle (1) did not stop when the police flashed their lights; (2) fled the stolen vehicle after crashing it; and (3) was later identified by R.H. as Vialpando.

¶ 28    That J.A. did not see who stole her car does not preclude the jury from finding that Vialpando was guilty. In *Harper*, 205 P.3d at 455–56, there was sufficient evidence to support the defendant's conviction for first degree aggravated motor vehicle theft despite the "little evidence to support a finding that [the defendant] stole the car from its owner" because "the evidence supports a reasonable inference . . . that [the defendant] exercised dominion over the car in a manner inconsistent with his authority." The evidence is sufficient to support that same inference here.

¶ 29    Also, evidence of flight to avoid arrest is admissible to show a culpable mental state when the defendant knew that the police were

seeking her. *See People v. Summitt*, 132 P.3d 320, 324 (Colo. 2006). So, even if Vialpando did not steal the car from J.A.'s home, a reasonable juror could infer that Vialpando was aware that she lacked authority to exercise control over the car when she drove away from the motel and crashed the car. *See Kessler*, ¶ 12 ("[A]n actor's state of mind is normally not subject to direct proof and must be inferred from his or her actions and the circumstances surrounding the occurrence . . . .").

¶ 30 Lastly, we reject Vialpando's assertion that there was insufficient evidence to support her aggravated motor vehicle theft conviction because the prosecution presented no evidence that she used threats or deception to obtain or exercise control over the car. The prosecution was required to prove that Vialpando exercised control over the motor vehicle of another without authorization *or* by threat or deception. § 18-4-409(2). Because sufficient evidence was presented proving that Vialpando knowingly exercised control over J.A.'s stolen vehicle without authorization, the prosecution was not also required to prove threat or deception.

## B. The Prosecutor's "Flight" Comments

¶ 31    During closing argument, the prosecutor told the jury that Vialpando "ran" away from the crashed car and that she "ran" away from the police officers in the motel parking lot. The prosecutor then said that "although she is seated now, that flight continues to this moment. But it ends today." Then, during rebuttal closing, the prosecutor told the jury that Vialpando's "flight has continued up and to this point."

¶ 32    Vialpando argues that the flight comments constituted prosecutorial misconduct because they were a direct and critical comment on her right to a jury trial.

¶ 33    In reviewing a prosecutorial misconduct claim, we first determine whether the conduct at issue was improper based on the totality of the circumstances, and if there was misconduct, we determine whether reversal is required under the applicable standard. *People v. McMinn*, 2013 COA 94, ¶ 59.

¶ 34    Because this claim was unpreserved, we review only for plain error. *Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010). "To constitute plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper, and it must so undermine the

13

fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *McMinn*, ¶ 58.

¶ 35    Vialpando had a constitutional right to a jury trial. U.S. Const. amend. VI. Defendants cannot be punished for exercising a constitutional right. *People v. Pollard*, 2013 COA 31M, ¶ 25. A defendant's exercise of the right to a trial by jury may not be used by the prosecution to infer guilt. *Dunlap v. People*, 173 P.3d 1054, 1080 (Colo. 2007); *People v. Rodgers*, 756 P.2d 980, 983 (Colo. 1988), *overruled on other grounds by People v. Miller*, 113 P.3d 743 (Colo. 2005). So, it is obviously improper for a prosecutor to tell the jury that the defendant should be condemned because she had the temerity to require the State to prove her guilt beyond a reasonable doubt. *Rodgers*, 756 P.2d at 983.

¶ 36    But that is precisely what happened here. During closing argument, the prosecutor said that Vialpando's "flight continues to this moment," and that her "flight has continued up and to this point." The prosecutor told the jury that Vialpando was continuing to run from responsibility by insisting on a jury trial. Neither the Attorney General nor the dissent provides any other reasonable meaning for these comments.

14

¶ 37 It was permissible for the prosecutor to argue that fleeing the crime scene was evidence of guilt. *Summitt*, 132 P.3d at 324. But, when Vialpando was sitting in the courtroom, she was not fleeing from anything; she was facing the jury and engaging in the process that the United States and Colorado Constitutions demand.

¶ 38 In *United States v. Hardy*, 37 F.3d 753 (1st Cir. 1994), the United States Court of Appeals for the First Circuit demonstrated the seriousness with which courts must view comments that prejudice defendants' exercise of their constitutional right to a jury trial. There, the First Circuit held that the trial court abused its discretion by not granting a mistrial when the prosecutor argued that the defendants were "still running and hiding today." *Id.* at 757, 759. The First Circuit held that a mistrial was necessary, despite the fact that the trial court had sustained the defendant's objection to the comment and had given the jury an instruction to disregard the comment. *Id.* at 757.

¶ 39 The misconduct perceived by the First Circuit in *Hardy* involved the right to remain silent under the Fifth Amendment, but the remark was equally prejudicial to the defendant's right to a fair jury trial under the Sixth Amendment. Also similar is the recent

Colorado Supreme Court case *Howard-Walker v. People*, which concluded that the prosecutor's remark that was "'intended' to emphasize [the defendant's] decision to remain silent" was "the most serious error [that] occurred." 2019 CO 69, ¶ 44 (citation omitted).

¶ 40 Thus, while Vialpando testified on her own behalf, that testimony did nothing to dispel the prejudicial effect of commenting on her right to a trial by jury. A prosecutor may not use the invocation of either right to infer the defendant's guilt. *Dunlap*, 173 P.3d at 1080. The supreme court has held that "there is 'no significant difference between the impropriety of a prosecutor's comments on a defendant's exercise of his right to remain silent and a prosecutor's comments on a defendant's exercise of his *equally fundamental right to a jury trial.*'" *Rodgers*, 756 P.2d at 983 (emphasis added) (quoting *People v. Rodgers*, 734 P.2d 145, 146 (Colo. App. 1986)). If anything, the right to a jury trial is among the most basic rights guaranteed to criminal defendants by both the Colorado and the United States Constitutions.

¶ 41 We conclude that the prosecutor here, like the prosecutors in *Hardy* and *Howard-Walker*, criticized the defendant for exercising

her constitutional right and unfairly prejudiced her in the eyes of the jury. This misconduct was flagrant, glaring, and tremendously improper.

¶ 42    The next question is whether this error requires reversal because it undermined the fundamental fairness of the trial, casting serious doubt on the reliability of the conviction. *McMinn*, ¶ 59.

¶ 43    One of the critical determinants of whether unpreserved errors require reversal is an evaluation of the quantity of the evidence of guilt. *See Howard-Walker*, ¶¶ 46–47. Logically, if the evidence is overwhelming, it is unlikely that even multiple instances of prosecutorial misconduct affected the jury's determination of guilt. But if the case is close, that same prosecutorial misconduct may well have influenced the verdict, thereby depriving the defendant of a fair trial. *See id.* at ¶¶ 46–48. "An improper comment that may seem insignificant where the evidence is overwhelming can assume a very different aspect in a close case." *Hardy*, 37 F.3d at 759.

¶ 44    The evaluation of the evidence of guilt in this case is not simple, even though it may appear to be at first glance. Without more, the discovery of multiple items belonging to Vialpando in the stolen car after it crashed appears to be strong evidence of guilt.

But Vialpando claimed, with record support from the testimony of a police officer, that she reported the robbery of those items *prior* to the chase and crash. The prosecution's theory was that the alleged robbery and the police reports were fabricated by Vialpando in an attempt to explain away the discovery of her personal items in the car.

¶ 45    But the uncontroverted evidence is that Vialpando made the police report of the alleged robbery *before* the chase and crash. To credit the prosecution's theory, the jury would have to cast Vialpando as a master criminal playing three-dimensional chess with the police, establishing her defense theory before she knew having one would be necessary. Of course, these factual determinations were, and are, for the jury.

¶ 46    But if Vialpando was robbed as she alleged, then the strength of the prosecution's evidence is reduced. Apart from the evidence found in the crashed car, the sole evidence linking her to the robbery is R.H.'s testimony that she was "75% sure" that it was Vialpando.

¶ 47    Because the evidence of Vialpando's guilt was not overwhelming, we conclude that the prosecutor's flight comments

undermined the fundamental fairness of her trial so as to cast serious doubt on the reliability of her convictions.  Thus, she must be given a new trial.

### C.    Cumulative Error

¶ 48     Vialpando also argues that the aggregate impact of numerous errors deprived her of a fair trial.  Although we reverse her convictions based on plain error, we also address her cumulative error argument because the determination of plain error is a difficult question on which judges may disagree.

¶ 49     We agree that cumulative error is an independent basis for reversing Vialpando's convictions.  The prosecutor's flight comments, coupled with four other instances of prosecutorial misconduct and an evidentiary error, deprived her of a fair trial.

¶ 50     When reviewing for cumulative error, a court asks whether the identified errors, in combination, deprived the defendant of her constitutional right to a fair trial.  *Howard-Walker*, ¶¶ 24–25.  This "standard governs, regardless of whether any error was preserved or unpreserved."  *Id.* at ¶ 26.

¶ 51     "[T]he question is not whether the errors were 'brief' or 'fleeting' but whether, viewed in the aggregate, the errors deprived

the defendant of a fair trial." *Id.* at ¶ 40. "[R]eversal is warranted when numerous errors in the aggregate show the absence of a fair trial, even if individually the errors were harmless or did not affect the defendant's substantial rights." *Id.* at ¶ 26.

¶ 52    In addition to the flight comments, we conclude that the prosecutor engaged in four kinds of prosecutorial misconduct, most of which were repeated multiple times.

### 1.    Improper Illustrations of Reasonable Doubt

¶ 53    First, during voir dire, the prosecutor attempted to illustrate the concept of beyond a reasonable doubt, but in doing so, he improperly trivialized the State's burden of proof.

¶ 54    The prosecutor asked potential jurors if they could recognize, "beyond a reasonable doubt," the American flag in the courtroom even though it was folded and not entirely visible. They all responded they could. The prosecutor then asked a potential juror if she was on the gameshow "Who Wants to be a Millionaire" whether she could identify the flag for the one-million-dollar question. The juror responded that it was the United States flag.

¶ 55    This colloquy trivialized reasonable doubt and, thus, attempted to lower the prosecution's burden of proof. *See People v.*

20

*Camarigg*, 2017 COA 115M, ¶ 45 (noting that reasonable doubt analogies can be inappropriate when they trivialize the State's burden). If the prohibition against "trivializing" reasonable doubt is to mean anything, then it must apply here, where the prosecutor analogized finding the defendant guilty to submitting an answer on a game show. In a similar case, the Washington Court of Appeals held that the prosecutor's remark, "[t]o be able to find reason to doubt, you have to fill in the blank," was flagrant misconduct. *State v. Johnson*, 243 P.3d 936, 939–41 (Wash. Ct. App. 2010).

¶ 56    It is also improper to illustrate reasonable doubt with "iconic images," like the American flag. *Camarigg*, ¶ 47 (citing cases holding that the use of the Statue of Liberty and Abraham Lincoln improper because they are iconic images). The danger is that, by using iconic, easily recognizable images, the jury may conclude that guilt beyond a reasonable doubt is easy to determine, and thus, that the reasonable doubt standard is a low burden of proof. These statements on reasonable doubt were improper.

2.    Improper Statements of Personal Belief

¶ 57    Next, during the prosecutor's opening statement, he told the jury, "I think you'll agree with me at the end of testimony, that the

defendant is guilty of the charges," and he later said, "I think you'll agree with me that it was, in fact, the defendant who ran." These two statements were clearly improper because they expressed "personal belief as to the guilt of the defendant by the prosecutor." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005).

¶ 58    And during closing argument, the prosecutor improperly expressed his personal opinion as to Vialpando's guilt for a third time by attacking her credibility. He told the jury that he did not have to prove why Vialpando made a false report "or what *we believe* is a false report" regarding Vialpando's reported robbery. (Emphasis added.)

3.    Improper Questions About the Veracity of Another Witness

¶ 59    It was also improper for the prosecutor to repeatedly ask Vialpando on cross-examination whether another witness, a police officer, was "mistaken." This is because it is categorically improper to ask a witness to opine on the veracity of another witness, and this prohibition includes questions asking whether another witness is mistaken. *Liggett v. People*, 135 P.3d 725, 732–35 (Colo. 2006). This improper question was repeated by the prosecutor *four times*.

22

### 4. Improper Mischaracterization of the Evidence

¶ 60　Lastly, the prosecutor mischaracterized the evidence in his closing argument. He asked the jury "why didn't [Vialpando] go out and get a new ID?" But Vialpando's unrebutted testimony was that she did get a new ID. Prosecutors may not misstate the evidence. *People v. Van Meter*, 2018 COA 13, ¶ 24.

¶ 61　Although these errors are less serious than the prosecutor's flight comments, "technical errors may have a significance requiring a reversal in a close case." *Howard-Walker*, ¶ 45 (quoting *Oaks v. People*, 150 Colo. 64, 67, 371 P.2d 443, 446 (1962)). As discussed in Part II.B, if the evidence of the items found in the car is explained away, this is a close case.

### 5. Improper Testimony Identifying Vialpando as the "Primary Suspect"

¶ 62　In addition to multiple instances of prosecutorial misconduct, testimony given by the lead investigating officer constituted evidentiary error. A witness may not opine that the defendant is guilty or testify that he or she believes the defendant committed the crime. *People v. Penn*, 2016 CO 32, ¶ 31.

¶ 63     But here, the lead investigating officer testified that Vialpando was the "primary suspect." The Attorney General contends that the officer's testimony was permissible both because police officers can properly explain steps they took in the course of their investigation and because the testimony dispelled any implication that the investigation was cursory.

¶ 64     But this testimony did nothing to explain the officer's investigation, nor did it bolster the thoroughness of the investigation. In no way did the testimony dispel any purported implication that the investigation was not thorough because simply naming a suspect demonstrates nothing about the thoroughness of the investigation that led to that conclusion.

¶ 65     Caution is warranted when the course-of-the-investigation exception is used to admit otherwise inadmissible evidence. *People v. Bobian*, 2019 COA 183, ¶ 51 (Berger, J., specially concurring) (citing *United States v. Cass*, 127 F.3d 1218, 1223 (10th Cir. 1997)). We conclude that the exception is inapplicable here.

¶ 66     Thus, the effect of the testimony identifying Vialpando as the primary suspect could only have been an improper one: demonstrating the officer's belief that Vialpando was guilty.

24

Although this was lay testimony, it contained an added degree of prejudice because the testimony was from the lead investigating officer in the case. *Martinez v. State*, 761 So. 2d 1074, 1080 (Fla. 2000) ("[T]here is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt.").

### 6. Cumulative Effect of the Errors

¶ 67 Under cumulative error review, the ultimate question is whether the errors deprived the defendant of a fair trial. *Howard-Walker*, ¶ 40.

¶ 68 There is no formula or algorithm into which an appellate court inputs errors, and then the formula spits out the result — harmless error or reversal. Rather, as the supreme court demonstrated in *Howard-Walker*, appellate judges must use careful judgment to evaluate the errors both individually and cumulatively to reach a conclusion whether the fairness of the trial was impaired. Not surprisingly, given this process, judges viewing the same evidence and acting entirely in good faith may come to different conclusions regarding harmlessness. Such is the case here.

¶ 69 In our view, the teaching of *Howard-Walker* is that when there are multiple instances of documented (not just alleged) prosecutorial misconduct, an appellate court must look long and hard at whether the defendant received a fair trial because a fair trial is the only constitutional means of depriving a person of his or her liberty. U.S. Const. amend. XIV.

¶ 70 From voir dire to closing arguments, Vialpando's trial was infected with errors. And like in *Howard-Walker*, these six identified errors occurred over the course of a relatively short trial — here, three days. *See Howard-Walker*, ¶ 3 (two days). The prosecutorial misconduct, in combination with the officer's improper testimony that Vialpando was the primary suspect, deprived her of a fair trial.

### D. Reliability of R.H.'s Identification

¶ 71 Vialpando next argues that the trial court reversibly erred by denying her motion to suppress the out-of-court photo identification. We address this argument because it is likely to arise on retrial. The trial court's findings on reliability are supported by the record, so we conclude that the identification was properly admitted.

## 1.    The Law

¶ 72    The constitutionality of pretrial identification procedures is a

mixed question of law and fact.  *Bernal v. People*, 44 P.3d 184, 190

(Colo. 2002); *People v. Martinez*, 2015 COA 37, ¶ 9.  We defer to the

trial court's factual findings, but "we may give different weight to

those facts and may reach a different conclusion in light of the legal

standard."  *Martinez*, ¶ 9.

¶ 73    Vialpando objected to the out-of-court identification, so "if the

district court erred, we apply the constitutional harmless error

standard to determine whether reversal is required."  *Id.* at ¶ 10.

"Under this standard, the prosecution must show that the error was

harmless beyond a reasonable doubt," and we reverse if there is a

reasonable possibility that the error contributed to the conviction.

*Id.*

¶ 74    To determine whether an out-of-court identification is

admissible, we apply a two-part test.  *Bernal*, 44 P.3d at 191.  The

defendant must first demonstrate that the identification was

impermissibly suggestive.  *Id.*  If the defendant does not carry her

burden, the inquiry is over and the identification is admissible.  If

the defendant meets this burden, the prosecution must

demonstrate that the identification was nevertheless reliable under the totality of the circumstances. *Id.* at 192.

¶ 75 The trial court found, with record support, that the lineup was impermissibly suggestive, so we proceed to the second part of the test and review whether the identification was nonetheless reliable. To determine reliability, courts consider the five *Bernal* factors: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *People v. Singley*, 2015 COA 78M, ¶ 15.

¶ 76 These factors, however, must sufficiently weigh against "the corrupting effect of the suggestive identification." *Id.* (quoting *People v. Borghesi*, 66 P.3d 93, 104 (Colo. 2003)). Identification testimony is admissible when "the totality of the circumstances does not suggest a very substantial likelihood of misidentification." *People v. Godinez*, 2018 COA 170M, ¶ 58 (quoting *Borghesi*, 66 P.3d at 104).

## 2.    Application

¶ 77    We conclude that the evidence presented at the suppression hearing supports the trial court's reliability finding.

¶ 78    As to the first factor, Vialpando argues that R.H.'s identification was unreliable because she saw the suspect for less than a minute after witnessing a highly traumatic event.  But the trial court found, with record support, that

> [R.H.] was not . . . the direct victim of any crime at that point, so she wasn't in some sort of fear or otherwise trying to figure out how to get out of a circumstance.  Instead she was simply a perceiving witness of an unusual event to have occurred within her proximity.

¶ 79    As to the second *Bernal* factor, Vialpando asserts that R.H.'s attention was divided because she watched two people flee the crash.  But R.H. gave a detailed description of the suspect's clothing, indicating that R.H. had a high degree of attention.  Also, the trial court found that she was not distracted by "other collateral matters, she was not listening to the radio, not on the telephone and was alone in the car."  Thus, the record supports the court's finding that "the accident itself focused [R.H.'s] attention as did the conduct of the occupants of the vehicle."

¶ 80    On the third factor, Vialpando argues that R.H.'s description was significantly inconsistent with Vialpando's appearance.  But the record refutes this claim.  R.H.'s description of the suspect's height and build matched Vialpando's height and build.  And while Vialpando had short hair at trial, several witnesses identified her as having long hair, photos presented at trial depicted her with long hair, and Vialpando acknowledged that she sometimes wore a wig.  (Vialpando also testified that the wig was one of the items that had been taken from her during the robbery.)  Regarding the age discrepancy, the court acknowledged that R.H.'s estimated age differed from Vialpando's age but recognized that an "individual may have difficulty estimating the age of an individual that they don't know, given the fact that people display their age very differently."  Also, R.H. testified that the suspect was wearing a lot of makeup, which the court noted could have made the suspect appear younger than her age.

¶ 81    As to the fourth factor — the level of certainty — Vialpando points to R.H.'s testimony that it was only "possible" that Vialpando was the woman she had seen fleeing the crash and that she was only seventy-five percent certain.  But the trial court noted that

30

R.H.'s uncertainty was driven by her desire "to be very certain about her identification and not overestimate." The court found R.H.'s testimony credible, concluding that her identification had "a high level of certainty."

¶ 82 Lastly, the court found that the length of time between the crime and the identification — approximately a week — was not "unacceptably lengthy" because what R.H. witnessed was "still relatively fresh in her mind." We agree. *See Bernal*, 44 P.3d at 194 (remanding to determine reliability when there was a six-week gap between the robbery and the photo array).

¶ 83 After weighing these factors against the suggestive identification procedures, we cannot conclude that the trial court erred in admitting the identification.

### E.    Reasonable Doubt Analogies

¶ 84 Finally, we briefly address Vialpando's claim regarding the trial court's reasonable doubt analogies during voir dire.

¶ 85 This case is the most recent installment in what appears to be a never-ending series of cases involving trial judges' well-intentioned but almost always misguided efforts to explain reasonable doubt with analogies and examples. "Since at least

1914, Colorado appellate courts have been discouraging trial courts from creating their own formulations of reasonable doubt." *People v. Knobee*, 2020 COA 7, ¶ 28. While always admonishing, our published and unpublished cases have not reversed when analyzing these problematic statements or instructions that attempt to further define reasonable doubt, with only one exception.[2] *Compare Knobee*, 2020 COA 7 (holding that the trial court's reasonable doubt instruction constituted structural error requiring reversal), *with People v. Tibbels*, 2019 COA 175 (cataloguing, in an appendix, twenty-three decisions addressing reasonable doubt explanations, none requiring reversal).

¶ 86     We are hopeful that the Colorado Supreme Court's recent decision in *Johnson v. People*, 2019 CO 17, will put the final nail in the coffin as to reasonable doubt analogies. There, the supreme court reasoned that the trial court's reasonable doubt comments

---

[2] Judge Dailey argued in dissent in *People v. Knobee* that not all statements made by a trial court on reasonable doubt are jury instructions, so not all erroneous statements on reasonable doubt require reversal under structural error. 2020 COA 7, ¶ 72 (Dailey, J., concurring in part and dissenting in part). Because we reverse on other grounds, we do not address whether the trial court's statements in this case were jury instructions.

were "problematic." *Id.* at ¶ 17. The court also noted the United States Supreme Court's admonition that attempts to further define reasonable doubt "do not provide clarity." *Id.* at ¶ 13 (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)).

¶ 87 Because we reverse Vialpando's conviction without regard to the problematic analogies used by the trial court, we do not decide whether the use of those analogies is a separate ground for reversal, on the basis of structural error or otherwise. Presumably, given the uniform rejection of these analogies by this court, the Colorado Supreme Court, and the United States Supreme Court, a retrial will not be burdened by such analogies.

### III.   Conclusion

¶ 88 The judgment of conviction is reversed. The case is remanded for a new trial.

JUDGE LIPINSKY concurs.

JUDGE FOX concurs in part and dissents in part.

JUDGE FOX, concurring in part and dissenting in part.

¶ 89    I agree with the majority's analysis of the sufficiency of the evidence challenge, and I need not say more on the subject. Likewise, I concur with the majority's analysis concerning Vialpando's identification challenges and her attack on the trial court's efforts to explain reasonable doubt. While I agree with significant portions of the majority's opinion, I cannot sign on to the portion of the opinion that finds reversible cumulative error. I also would not conclude that the prosecutor's "flight" comments punished Vialpando for exercising a constitutional right. In my view, the majority asks too much of the trial judges whose primary and rightful role is to neutrally administer justice, not to insert themselves into a trial with competent counsel on each side. Because, in my view, any error does not warrant reversal, I would affirm the judgment of conviction.

¶ 90    The majority fairly sets out the procedural history and the operative facts. Accordingly, I will not repeat those here except as necessary to explain my reasoning.

34

## I.     Prosecutorial Misconduct

¶ 91     Vialpando contends that the trial court reversibly erred by allowing the prosecutor to commit misconduct during voir dire, opening remarks, closing and rebuttal closing remarks, and her cross-examination. I conclude that any asserted misconduct does not warrant reversal.

### A.     Additional Background

¶ 92     During voir dire, the prosecutor used two analogies to question potential jurors about the reasonable doubt standard. First, the prosecutor pointed to a folded United States flag that was behind the trial judge, asking a potential juror to explain how he could tell it was a United States flag. The following colloquy occurred:

> [Prosecutor]: You said it's an American flag. How can you tell?
>
> [Potential Juror]: Because of the stars and the stipes and the color. . . . I don't know how many stars are on it.
>
> . . . .
>
> [Prosecutor]: Isn't it possible that just to trick [potential juror] I snuck in here last night and I got a different flag and I put it up there behind the judge and carefully arranged it . . .

so I could trick somebody? . . . [D]oes that mesh with your common sense?

[Potential Juror]: No.

[Prosecutor]: Okay. Would you say that that is speculative?

[Potential Juror]: Yes.

[Prosecutor]: All right. . . . If you were on Who Wants to be a Millionaire and the final question for $1 million is, What is that object? What would your answer be?

[Potential Juror]: A United States flag.

[Prosecutor]: Even though you can't see every little bit of that flag?

[Potential Juror]: Yes.

[Prosecutor]: Now, is that based on your own reason and common sense?

[Potential Juror]: Yes.

. . . .

[Prosecutor]: Would you believe that that flag is an American flag beyond a reasonable doubt?

[Potential Juror]: Yes.

¶ 93    During the prosecutor's opening remarks, he stated, regarding the evidence against Vialpando, that "I think you'll agree with me at the end of testimony — that the defendant is guilty of the charges,"

and that "at the end of [the evidence presentation] I think you'll agree with me that it was, in fact, the defendant who ran."

¶ 94     During Vialpando's cross-examination, the following colloquy occurred:

> [Prosecutor]: So if the Denver police officer had written that [Vialpando was transient] in his report, he would be mistaken?
>
> [Vialpando]: I didn't become homeless until after this, when I had to stay and testify or do what I had to do to get this resolved.
>
> . . . .
>
> [Prosecutor]: So if the Denver police officer had noted that you had long brown hair in his report, he would be mistaken?
>
> [Vialpando]: Well, I did have hair, but it's in my luggage, and I can wear it, so stolen.  But I didn't have hair that day.
>
> . . . .
>
> [Prosecutor]: So my question was, though, when you went down to the police station, if the Denver police officer had written that you had long brown hair, you would be mistaken? Or he would be mistaken?
>
> [Vialpando]: Yeah. . . .
>
> . . . .
>
> [Prosecutor]: I would just like you to answer my question.  If the officer wrote that you had

long brown hair in his report, he would be mistaken?

[Vialpando]: Could be.

¶ 95    The prosecutor later began his closing arguments with the following statement:

> Yolanda Vialpando, ran. A few moments before she had crashed a stolen 2006 Mercury Mariner . . . [s]he opened the driver's-side door and ran. . . . Before that she had run . . . from the officers. . . . The defendant ran. And although she is seated now, that flight continues to this moment. But it ends today.

¶ 96    He similarly ended rebuttal closing:

> The defendant ran that day. She ran from the police, and she ran after she had an accident that left in its wake [E.H.] severely injured and in pain to this day. And that flight has continued up and to this point. And it ends with you. It ends when you go back to the jury deliberation room and you take out the most powerful tool in this courtroom, a pen, and you end her flight by signing "guilty[.]"

¶ 97    In reference to R.H.'s trial testimony, the prosecutor stated that R.H. was able to

> identify [Vialpando] today . . . she was able to identify her facial features, her body structure, . . . [s]he was able . . . to point the finger and say, yeah . . . that's her. I'm not 100 percent sure because she was wearing makeup, but, yeah, that's who I saw get out of the car.

¶ 98    During defense counsel's closing statements, the trial court

reminded jurors that "opening statements and closing arguments

are not evidence.  The closing arguments, as I told you earlier, are

what the attorneys themselves think the evidence has shown.  And

so I want to remind you that it is not evidence that you can

consider other than for their argument."

¶ 99    During rebuttal closing, the prosecutor began with an analogy:

> So far this reminds me of a story of a game
> warden who was tasked in a small town of
> policing a fishing pond.  And so he went down
> there one day at about dusk, saw a guy
> walking away from that pond with . . . buckets
> full of fish.  And people don't typically have
> licenses, and so he goes up to him and he
> says, excuse me, sir, do you have a license for
> those fish?  And he says, well, no, sir.  These
> are my pet fish.  And the game warden says,
> what do you mean, your pet fish?
>
> He says, well, I have my pet fish and I take
> them down to the lake every night and I dump
> them out into the lake and I let them swim
> around a little bit, and then I whistle and they
> jump back into the bucket and we go home.
> And the game warden says, well, I don't believe
> that.  But he's intrigued at this point so he
> figures he's got to go see this for himself.  So
> he says, all right.  You take me down to the
> lake and you show me.  He says, all right.
>
> So they go down to the shore of the lake.  The
> man, he dumps the fish into the lake, and they

swim away.  They wait there for a minute.  The game warden says, well?

The guy says, well, what?

Well, call them back.

Call who back?

The fish.

What fish?

Now, members of the jury, this is a "what fish" type of case where you have an identification based on a witness with no stake in this case from a six-pack lineup, that saw that person get out of the car and identify her in court today.  And if you believe her it's a guilty verdict.  Stacked up against a "what fish" from the defendant, Ms. Vialpando.

¶ 100    Regarding Vialpando's testimony that she was robbed, the

prosecutor stated,

Now, I'm not saying she has some kind of magic crystal ball.  I'm not saying that she didn't make that report.  But what's important isn't whether she made the report, what's important is whether or not she was robbed.  Because if she wasn't robbed, she still has those items on her for when she left them in the car the next day.  Because let's face it, there are lots of reasons people might make a police report.  We heard the officer testify from Denver, the star witness for the defense, that there's a lot —

40

¶ 101    Defense counsel objected to the "star witness" characterization of Officer Iverson, and the court reminded the jurors that "this is not evidence, you are to consider it as argument."

¶ 102    The prosecutor continued,

> You can go on and on and on for all the other reasons that she might have made this up to the officers, but the bottom line is it's a red herring. It's a "what fish" story. And the only thing we need to look at is the story itself for us to figure out that it doesn't make sense. . . . And then we have, for lack of a better word, a cartoonish version of a robbery. A man stops you and says "stick 'em up" with a ski mask on? No details beyond that? Nothing to corroborate it?
>
> And then, quote, "I proceeded to walk west," is what she said. And then when [defense counsel] pressed her on that, said, Well, why didn't you run? She testified, Well, I don't know why I didn't run. And had to be prompted, Well wasn't your foot hurting? Oh, yeah, my foot was hurting. My foot was injured. That's why I didn't run.
>
> I think we all saw what happened yesterday during her testimony. But that wasn't the only prompting that Ms. Vialpando was receiving as she was testifying. I'm asking you to use your own common sense when that was occurring.

¶ 103    Regarding Vialpando's Denver robbery police report, the prosecutor told the jury, "I don't have to explain to you why the

defendant made that report. It's not my burden to do that."

Defense counsel objected, and the court again reminded jurors that

closing statements "are argument. You have already received all of

the evidence that you may properly consider." The prosecutor

continued,

> I don't have the burden to prove to you why
> she did what she did as far as that false report
> — or what we believe is a false report. What
> the evidence has showed is a false report.
> What I do have to show is that she was driving
> that car. And [R.H.] is the person to look to for
> that. The fact is that her purse and that all of
> her items were found in that car and not the
> car that she said the person who reputatively
> robbed her was driving.

## B.     Preservation and Standard of Review

¶ 104    In reviewing a prosecutorial misconduct claim, we first

determine whether the conduct at issue was improper based on the

totality of the circumstances, and if there was misconduct, we next

determine whether the misconduct warrants reversal under the

applicable reversal standard. *People v. Galvan*, 2019 COA 68, ¶ 57

(*cert. granted* Jan. 13, 2020).

¶ 105    "Whether a prosecutor committed misconduct is an issue

within the trial court's discretion." *People v. Van Meter*, 2018 COA

13, ¶ 25. Accordingly, we ask not "whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options." *Id.* (quoting *People v. Rhea*, 2014 COA 60, ¶ 58).

¶ 106 Vialpando's attorney generally failed to contemporaneously object to the prosecutor's statements that she challenges on appeal except for the prosecutor's characterization of Iverson as her "star witness" and the prosecutor's statement that it was not his burden to explain why Vialpando filed a robbery report. I review these two preserved contentions for harmless error, reversing only if the error affected Vialpando's substantial rights, meaning the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Hagos v. People*, 2012 CO 63, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 107 I review Vialpando's other, unpreserved contentions for plain error, reversing only for an "obvious and substantial" error. *Hagos*, ¶ 14. It is rare for prosecutorial misconduct in closing argument to be so egregious that it constitutes plain error. *Rhea*, ¶ 43.

## C. Law and Analysis

¶ 108 Claims of improper argument are assessed "in the context of the argument as a whole and in light of the evidence before the jury." *Van Meter*, ¶ 24 (citation omitted). During closing remarks, prosecutors have wide latitude in the language and style they choose to employ, especially in responding to an argument by defense counsel. *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005); *People v. Perea,* 126 P.3d 241, 247 (Colo. App. 2005). A prosecutor "may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance, so long as he or she does not thereby induce the jury to determine guilt on the basis of passion or prejudice, attempt to inject irrelevant issues into the case, or accomplish some other improper purpose." *Van Meter*, ¶ 24 (quoting *People v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003)). Additionally, "because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *People v. Samson,* 2012 COA 167, ¶ 30.

¶ 109 However, a prosecutor may not misstate the evidence or the law. *Van Meter*, ¶ 24. Nor may a prosecutor denigrate defense

counsel or imply that defense counsel has presented the defendant's case in bad faith. *People v. Collins*, 250 P.3d 668, 678 (Colo. App. 2010). But, a prosecutor may comment on the strength of the defense's theories, or the absence of evidence to support a defendant's contentions, and, in doing so, does not shift the burden to the defense. *People v. Serra*, 2015 COA 130, ¶ 88; *People v. Estes*, 2012 COA 41, ¶ 28.

¶ 110 On cross-examination, a prosecutor may ask "non-prejudicial questions that highlight the discrepancies and later emphasize any conflicting accounts by juxtaposing them in closing argument." *Liggett v. People*, 135 P.3d 725, 732 (Colo. 2006). However, when a prosecutor asks a witness to opine on the veracity of another witness, such questioning invades the province of the fact finder and is categorically improper. *Id.* And "were they lying" type questions — including asking a defendant whether another witness was "mistaken" — are improper. *People v. Koper*, 2018 COA 137, ¶ 32. But, under the plain error standard, even when a prosecutor asks a defendant if another witness "made up" something, to be an "obvious" error, the error must also be "substantial"; and reversal is

warranted only if the error was "seriously prejudicial." *People v. Kessler*, 2018 COA 60, ¶¶ 47-48.

¶ 111   When determining whether a prosecutor's statements were improper and whether reversal is warranted, we may consider the language used, the context of the statements, whether a statement improperly expressed the prosecutor's personal opinion, whether the statement was an acceptable comment on the credibility of witnesses, the strength of the evidence, whether the evidence is conflicting or inconclusive, whether the prosecutor improperly appealed to the jurors' sentiments, whether the misconduct was repeated, and any other relevant factors. *People v. Walters*, 148 P.3d 331, 335 (Colo. App. 2006); *see also People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010) ("To determine whether prosecutorial misconduct requires reversal, we must evaluate the severity and frequency of the misconduct, any curative measures taken by the trial court to alleviate the misconduct, and the likelihood that the misconduct constituted a material factor leading to the defendant's conviction."). And we may "consider a lack of contemporaneous objection by the defendant" as demonstrating the defense's belief "that the live argument, despite its appearance in a cold record, was

not overly damaging." *Walters*, 148 P.3d at 334 (quoting *Domingo-Gomez*, 125 P.3d at 1054). We also focus on the cumulative effect of a prosecutor's statements, looking to the language used, the nature of the misconduct, the degree of prejudice to the defendant, the surrounding context, and the strength of the evidence against the defendant. *People v. Nardine*, 2016 COA 85, ¶ 65.

### 1. Voir Dire Reasonable Doubt Illustration

¶ 112    Vialpando first contends that the prosecutor's use of the folded American flag during voir dire and asking jurors if they would identify it as an American flag on the gameshow "Who Wants To Be a Millionaire?" was improper. Specifically, she argues that it impermissibly (1) quantified the prosecution's burden of proof by suggesting that the jurors' ability to recognize the flag — where only a portion of it was visible — equaled proof beyond a reasonable doubt, and (2) trivialized the burden of proof by comparing the reasonable doubt standard to a trivia question for money.

¶ 113    Assuming the challenged conduct was improper, the trial court did not commit plain error absent a contemporaneous objection. *See Van Meter*, ¶ 32 (holding that the prosecutor's puzzle analogy during voir dire was improper but not plain error); *People v.*

*Carter*, 2015 COA 24M-2, ¶ 58 (assuming that allowing the use of a puzzle analogy was improper and concluding that it was not obvious under plain error review); *Walters*, 148 P.3d at 334; *see also Rhea*, ¶ 43.

¶ 114     First, the trial court properly instructed the jury multiple times on the proper meaning of reasonable doubt, and I presume the jury followed the court's instructions. *See People v. Tibbels*, 2019 COA 175, ¶ 39.  Second, the prosecutor's use of the flag and gameshow analogy was relatively brief and isolated. *See Van Meter*, ¶ 33; *Carter*, ¶ 60.  Indeed, the prosecutor did not reference the analogy in closing arguments. *See Van Meter*, ¶ 31 (holding that the prosecutor's use of a puzzle analogy during voir dire was improper but not plain error where the prosecutor also showed the image during closing arguments).  And third, the prosecutor's reasonable doubt illustrations, when taken in context, were not an attempt to present inadmissible factual matter or to argue the prosecution's case to the jury. *See People v. Krueger*, 2012 COA 80, ¶ 50 ("A prosecutor engages in prosecutorial misconduct during voir dire when she misstates the law or 'intentionally use[s] the voir dire to present factual matter which the prosecutor knows will not be

admissible at trial or to argue the prosecution's case to the jury.'" (quoting *People v. Adams*, 708 P.2d 813, 815 (Colo. App. 1985))).

¶ 115 Accordingly, any error was neither obvious nor substantial, and given the strength of the evidence against Vialpando, *see Walters*, 148 P.3d at 335, I cannot conclude that the prosecutor's reasonable doubt analogies so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction, *see Hagos*, ¶ 14.

## 2. Opening Statement

¶ 116 Vialpando next asserts that the prosecutor's remark during opening statements that he believed that she was guilty of the charges was an improper expression of his personal opinion of Vialpando's guilt. *See Krueger*, ¶ 50 ("[A] prosecutor may not . . . offer a personal opinion as to the defendant's guilt.").

¶ 117 Assuming the prosecutor's remark was improper, it did not amount to plain error. The comments made up a small part of the prosecutor's opening argument, during which the prosecutor generally fairly summarized the evidence and provided evidence-based reasons why the jury should find Vialpando guilty. *See Van Meter*, ¶ 24. Vialpando's counsel did not object to the statement.

*See Walters*, 148 P.3d at 334.  Further, the trial court provided the jury with proper credibility and presumption of innocence instructions.  *See Strock*, 252 P.3d at 1153.  Thus, while the statement may have been inartful, *see Samson*, ¶ 30, I cannot conclude that it so undermined the trial's fundamental fairness as to cast serious doubt on the reliability of the verdicts, *see People v. Wilson*, 2014 COA 114, ¶ 56; *see also Rhea*, ¶ 43.

### 3.    Vialpando's Cross-examination

¶ 118    Vialpando argues that the prosecutor's questions during her cross-examination, asking whether other witnesses were "mistaken" in their testimony, improperly required her to comment on witness veracity.  I agree that asking Vialpando if other witnesses were "mistaken" was improper, *see Koper*, ¶ 32, but conclude that it did not amount to plain error, *see id.* at ¶¶ 47-48.

¶ 119    While the statements were obviously improper, and the trial court should have stepped in, the error was not substantial.  The prosecutor did not comment on Vialpando's credibility or that of the other witnesses, and defense counsel did not object.  *See Walters*, 148 P.3d at 334-35.  The prosecutor's improper line of questioning was also limited.  *See Kessler*, ¶¶ 47-52 (holding that the

50

prosecutor asking the defendant whether a detective "made up" something was not a "substantial" error where the question was only a small part of the defendant's testimony, the question was less damaging than explicitly asking if defendant thought the officer was "lying," and the evidence against defendant was strong); *cf. Koper*, ¶ 45 (holding that the prosecutor asking the defendant whether another witness was lying constituted plain error because "[a]lmost the entirety" of the prosecutor's cross-examination consisted of "impermissible questions"). Lastly, I cannot conclude that the error was substantial because it does not undermine my confidence in the jury's verdicts. *See People v. McBride*, 228 P.3d 216, 224 (Colo. App. 2009) (holding that although the prosecutor's statements were obvious error, they did not constitute plain error because the conduct "was not sufficient to undermine our confidence" in the verdict).

### 4.   Closing and Rebuttal Remarks

¶ 120   Vialpando first argues that the prosecutor's flight remarks during closing and rebuttal were improper because they used Vialpando's exercise of her right to a jury trial to create an inference

of guilt and undermined her presumption of innocence, thereby lowering the prosecution's burden of proof. I disagree.

¶ 121 While possibly inartful, *see Samson*, ¶ 30, the prosecutor's flight remarks were merely examples of oratorical embellishment and metaphorical nuance, *see Van Meter*, ¶ 24. The prosecutor was not attempting to inject irrelevant issues into the case but rather was highlighting his argument, based on evidence presented, that Vialpando fled from the police on December 30, 2015, in the motel parking lot and after the car crash. *See id.* Moreover, I cannot conclude that the prosecutor lowered the burden of proof given that the jury was properly instructed that closing statements were not evidence and that the prosecution had to prove every element beyond a reasonable doubt. *See Strock*, 252 P.3d at 1153.

¶ 122 This case differs from *United States v. Hardy*, 37 F.3d 753 (1st Cir. 1994) — on which the majority relies heavily — in several significant ways. First, in *Hardy* neither of the two defendants testified, and the only possible connotation of the running and hiding statement was "that the defendants were running from the evidence presented against them, and hiding behind their right to silence during the trial." *Id.* at 758. Here, unlike in *Hardy*,

Vialpando did testify, so the prosecutor's statement that her "flight continues to this moment" was not an improper comment on Vialpando's exercise of her Fifth Amendment right to silence or Sixth Amendment right to a jury trial. Rather, the prosecutor's language is better understood, in context, as arguing that the evidence at trial established that Vialpando first ran away from police in the stolen car after officers spotted the stolen car in the motel parking lot and, later, ran away from the stolen car after she crashed it. Second, in *Hardy*, the defense counsel objected promptly and moved for a mistrial. Here, in contrast, there was no contemporaneous objection on this basis, which perhaps underscores the unimportance counsel attached to the now alleged impropriety at trial. *See Walters*, 148 P.3d at 334; *see also United States v. Stark*, 507 F.3d 512, 519-20 (7th Cir. 2007) (distinguishing *Hardy* and concluding that, viewed in context, the use of "hiding" in the prosecution's closing was not plain error). Finally, the evidence implicating the defendants in *Hardy* was not particularly strong. 37 F.3d at 759. The evidence against Vialpando in this case, by contrast, was significantly stronger: R.H.

53

gave eyewitness testimony and Vialpando's belongings were found in J.A.'s stolen vehicle.

¶ 123   Although the *Hardy* decision does not control here — and I do not find it particularly persuasive in Vialpando's case — prosecutors should recognize the hazard involved in using words like "run" and "flight" to characterize a defendant's trial strategy, especially in a case where she does not testify.  Accordingly, skilled and disciplined prosecutors should "resist the temptation to use rhetorical cliches that threaten mistrials or reversals on appeal." *Commonwealth v. Coyne*, 686 N.E.2d 1321, 1325 (Mass. App. Ct. 1997).

¶ 124   Second, Vialpando argues that the prosecutor's references to her defense theory as a "red herring" and the "what fish" story improperly suggested to the jury that Vialpando's defense was not asserted in good faith.  She also contends that the prosecutor's reference to Iverson as the defense's "star witness" was meant to suggest that she made a false report to the Denver police; thus, she contends that these veracity comments constituted improper bad character arguments.  I disagree.

¶ 125    Given the prosecutor's wide latitude in responding to defense counsel's arguments in rebuttal closing, *see Domingo-Gomez*, 125 P.3d at 1048; *Perea*, 126 P.3d at 247, including the use of oratorical embellishment and metaphorical nuance, *see Van Meter*, ¶ 24, I conclude that the challenged statements were not improper. Rather, the prosecutor was using these metaphors to argue, based on reasonable inferences from the evidence presented, that Vialpando's defense theory was weak, pointing to the lack of evidence to support her robbery theory. *See Serra*, ¶ 88; *Estes*, ¶ 28; *Walters*, 148 P.3d at 334 (A prosecutor "may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence."); *see also Strock*, 252 P.3d at 1155 ("[T]he prosecutor's comments on the lack of evidence to support Strock's defense theory that he was not driving at the time of the accident did not improperly shift the burden of proof to Strock. Thus, we conclude there was no error, much less plain error.").

¶ 126    Third, Vialpando argues that the prosecutor's statement during closing that defense counsel was "prompting" Vialpando to testify a certain way suggested that she engaged in unethical

conduct and implied that defense counsel did not have a good faith belief in Vialpando's innocence. I again disagree.

¶ 127 When viewed in context*, see Van Meter*, ¶ 24, the prosecutor's statement was not meant to denigrate Vialpando or her counsel. Rather, it was an attempt to refocus the jury's attention on relevant evidence and to encourage the jury to reject Vialpando's defense theory that she had been robbed. *See Serra*, ¶ 89 (recognizing that while "[r]eferences to a defendant's or defense counsel's diversionary tactics" may be improper when used to denigrate the defendant or defense counsel, such references are not "improper if, viewed in context, they are attempts to draw the jury's focus to relevant evidence"); *see also Wilson*, ¶ 52 ("Counsel may also properly comment on how well and in what manner a witness's testimony measures up to the tests of credibility on which the jury is instructed.").

¶ 128 Nor do I agree that the prosecutor's "prompting" statement was an improper attempt to imply that Vialpando's counsel did not have a good faith belief in her client's innocence. *Cf. People v. Jones*, 832 P.2d 1036, 1038-39 (Colo. App. 1991) (holding that the prosecutor's statements that "defense counsel should, or did, know

56

the true facts concerning defendant's presence upon the premises and that she should concede the accuracy of the prosecution's testimony" improperly implied to the jurors that opposing counsel did not have a good faith belief in her client's innocence). Accordingly, the challenged comment was merely another attempt by the prosecutor to highlight relevant evidence; it was not an attempt to divert the jury's attention away from the facts of the case or make an improper emotional appeal. *See Carter*, ¶ 72; *cf. Nardine*, ¶ 67 (holding that the prosecutor's misconduct constituted plain error where he "repeatedly diverted the jurors' attention from the facts of the case," "appealed to community sentiment," and "made an emotional appeal to their religious convictions" by "mischaracteriz[ing] and denigrat[ing] the defense theory").

¶ 129     Fourth, Vialpando asserts that the prosecutor impermissibly shifted the burden of proof by stating that it was not his burden to explain why Vialpando filed the Denver police report, implying that the defense had the burden to prove that her report was not false. Although the prosecutor's statement may have been inartful, *see Samson*, ¶ 30, it was also harmless given that the court repeatedly properly instructed the jury — orally and in writing — on the

prosecution's burden of proof and Vialpando's presumption of innocence, *see Hagos*, ¶ 12.

¶ 130 Fifth, Vialpando contends that the prosecutor misstated the law on vehicular eluding and aggravated motor vehicle theft. I disagree.

¶ 131 When reviewing the vehicular eluding charge during closing, the prosecutor stated,

> Eluded or attempted to elude. When you pull away from the officers, when you run the stop lights, it doesn't matter necessarily if they are pursuing you, that you are eluding or attempting to elude that police officer.

¶ 132 While possibly inartful, *see Samson*, ¶ 30, the prosecutor did not misstate the law. Rather, when viewed in context, *see Walters*, 148 P.3d at 335, the prosecutor was attempting to explain that a defendant need not get away from the police in order to commit vehicular eluding, *see* § 18-9-116.5, C.R.S. 2019. The prosecutor followed the challenged statement by stating "that's clearly what that driving behavior indicates, going on through the on ramp," and noting that while J.A.'s stolen vehicle "didn't get very far," the driver was nonetheless attempting to elude the police.

¶ 133    Regarding the aggravated motor vehicle theft charge, the

prosecutor stated,

> The defendant does not necessarily need to be
> the person who stole the car.  I want you to
> read that instruction very closely.  She doesn't
> necessarily have to be the person who took the
> car from [J.A.'s] driveway on December 19.  All
> that we would have to show is that she
> exercised control over the motor vehicle of
> another without authorization.  Who knows
> who owns the car that you're driving?  Well,
> you should know.  A reasonable person should
> know who owns that car.  It was clearly a
> stolen vehicle.

¶ 134    I also conclude that the prosecutor did not misstate the law on

aggravated motor vehicle theft.  Vialpando misstates the record in

arguing that the prosecutor's statement misled the jury to believe

that the prosecution was not required to prove that Vialpando

knowingly exercised control over the car without authorization.

Rather, taken in context, the prosecutor was arguing that

Vialpando knew she lacked authority to drive J.A.'s vehicle.  *See*

*Van Meter*, ¶ 24; *Walters*, 148 P.3d at 335.  And as with the

vehicular eluding charge, the jury was properly instructed on the

elements of aggravated motor vehicle theft.  *See Strock*, 252 P.3d at

1153.

¶ 135   Lastly, Vialpando argues that the prosecutor misstated the evidence by (1) stating that R.H. identified Vialpando's "facial features" and that she pointed at Vialpando during trial and said that "that's who I saw get out of the car"; (2) posing several rhetorical questions regarding Vialpando's actions by asking if Vialpando was robbed, why did she not attempt to get a replacement identification or health insurance card or replace her debit card; and (3) stating that Vialpando made "further denials" about her 1997 felony convictions.

¶ 136   While prosecutors may not misstate the evidence, *see Van Meter*, ¶ 24, I am not aware of any Colorado law that requires a prosecutor to repeat witness testimony verbatim rather than summarize evidence in closing.  And I reject Vialpando's assertion that the prosecution's rhetorical questions, referencing her defense theory, misstated the evidence.  Rather, it was mere oratorical embellishment, *see id.*, where the prosecutor was free to comment on the strength of Vialpando's defense theory.  *See Serra*, ¶ 88; *Estes*, ¶ 28.  Nor did the prosecutor misstate the evidence when he stated that Vialpando denied her prior trespass conviction.  Vialpando acknowledged that such a conviction was "possible," but

she also testified that she did not remember being convicted of trespass.

¶ 137    Given the wide latitude granted prosecutors during closing, *see Domingo-Gomez,* 125 P.3d at 1048; *Perea,* 126 P.3d at 247, the benefit of the doubt afforded them when their comments are ambiguous, *see Samson,* ¶ 30, and the fact that the jury was repeatedly instructed that closing arguments were not evidence, I cannot conclude that the prosecutor misstated the evidence.

## II.    Lay Witness Testimony

¶ 138    Vialpando next contends that the trial court reversibly erred by admitting lay witness testimony from Thornton Police Officer John Milstead that Vialpando was the primary suspect, thereby usurping the jury's role to decide whether Vialpando was guilty of the charged crimes.  I disagree.

### A.    Additional Background

¶ 139    At trial, Milstead testified as a lay witness for the prosecution. In discussing Vialpando's arrest, the following colloquy occurred:

> [Prosecutor]: Based on all of the information that you had received, Officer, the hard evidence that you collected and the witness statements that you had received, did you

> identify the person who — that you believed had committed this offense?
>
> [Milstead]: Based on the facts, yes.
>
> [Prosecutor]: And who is that person?
>
> [Milstead]: The defendant.

¶ 140 Defense counsel objected, arguing such a response invaded the province of the jury, and the court sustained the objection. The prosecutor then asked Milstead whether he had identified "a primary suspect," to which he replied that he had and identified Vialpando. Defense counsel did not object.

### B. Preservation and Standard of Review

¶ 141 We review a trial court's decision to admit testimony for an abuse of discretion. *People v. Robles-Sierra*, 2018 COA 28, ¶ 23. An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *People v. Casias*, 2012 COA 117, ¶ 29.

¶ 142 Because Vialpando did not preserve this issue for appeal, I apply plain error review. *Hagos*, ¶ 14. Thus, reversal is warranted only if any error was obvious and substantial, meaning the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Id.*

62

## C. Law and Analysis

¶ 143  CRE 701 governs the admission of lay witness testimony and provides that testimony is proper if it is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

¶ 144  A testifying witness may not usurp the jury's factfinding role. *Robles-Sierra*, ¶ 24.  However, CRE 704 provides that opinion testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  In determining whether witness testimony usurped the function of the jury, it is useful to consider whether (1) the witness opined that the defendant committed or likely committed the crime; (2) the testimony was clarified on cross-examination; (3) the expert's testimony usurped the trial court's function by expressing an opinion on the applicable law or legal standard; and (4) the jury was properly instructed on the law and that it could accept or reject the witness' opinion.  *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011).  Further, while a witness cannot testify as to his belief that

the defendant committed the charged crime, "police officers may testify about the reasons they took certain investigative steps, even where this testimony touches upon prohibited subjects." *People v. Penn*, 2016 CO 32, ¶¶ 31-32.

¶ 145    Vialpando argues that Milstead's testimony that she was the primary suspect demonstrated his belief that she was guilty of the charged crimes, improperly usurping the jury's function. I disagree with the majority that the effect of Milstead's testimony identifying Vialpando as a suspect could only have been an improper one.

¶ 146    Milstead's statement responded to the prosecutor's question regarding the then subject of the investigation. *See id.* It is not clear that the officer's testimony amounted to an opinion that Vialpando was guilty of the charged crimes as opposed to explaining the course of his investigation. *See id.* at ¶¶ 29, 33 (holding that an officer's statement that he had "reason to arrest" the defendant merely "provided context for his action and simply explained . . . the next step in his investigation").

¶ 147    Nor can I conclude that Milstead's testimony amounted to plain error. *See Hagos*, ¶ 14. The prosecutor did not dwell on his statement, nor did either party revisit this testimony during closing

argument. *See Penn*, ¶ 33. Further, Vialpando's counsel had the opportunity to clarify Milstead's testimony on cross-examination when, through questioning, the officer admitted that R.H. was not one hundred percent certain regarding her identification and that a witness told police that the man exiting J.A.'s stolen vehicle may have been the driver. And, the jury was properly instructed that it was not bound by the testimony of witnesses but could believe all, part, or none of their testimony. *See Rector*, 248 P.3d at 1203 (holding that an expert's testimony on an ultimate issue did not constitute plain error where "the jury was properly instructed on the law and its ability to accept or reject the expert witness testimony"); *People v. Rivera*, 56 P.3d 1155, 1164 (Colo. App. 2002) (Even if a "witness opines with respect to an ultimate issue, the jury retains its authority to determine the facts from the evidence and accept or reject such opinions.").

## III.   Cumulative Error

¶ 148   Vialpando last argues that the asserted errors, when analyzed in the aggregate, require reversal because they undermined the fundamental fairness of the proceedings. I disagree.

¶ 149    Under the doctrine of cumulative error, reversal is required when numerous errors "collectively prejudice the substantial rights of the defendant." *Howard-Walker v. People*, 2019 CO 69, ¶ 25.  A conviction will not be reversed unless the cumulative effect of any errors created "cumulative prejudice" and "substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process."  *Id.* at ¶¶ 24-25 (citation omitted).

¶ 150    I have found no errors save for the court allowing the prosecutor's reasonable doubt voir dire illustration, the prosecutor's brief statement during opening remarks about Vialpando's guilt, and the prosecutor cross-examining Vialpando as to whether other witnesses were mistaken.  Even considered in the aggregate, the prosecutor's misconduct here does not rise to the level of plain error.  *See Domingo-Gomez,* 125 P.3d at 1054 (holding that no plain error occurred where the prosecutor stated that "defense witnesses lied and made up their stories" and defense counsel failed to make a contemporaneous objection); *People v. Ujaama,* 2012 COA 36, ¶¶ 73-74 (holding that the prosecutor's statement during closing did not constitute plain error where he undermined defendant's presumption of innocence and improperly gave his personal opinion

on the case by stating that the defendant had "shattered his presumption of innocence," and that the "only way to obtain justice in this courtroom, to seek what [the jury] . . . sought when [it] took that oath as jurors, is to find [defendant] guilty of the murder that he committed") (alterations in original).

¶ 151   Because (1) the prosecutor's misconduct does not carry different weight under a cumulative error analysis; (2) the misconduct was not overly prejudicial; and (3) the evidence against Vialpando was strong — R.H. gave eyewitness testimony and Vialpando's belongings were found in J.A.'s stolen vehicle — I conclude that Vialpando was not deprived of a fair trial.  *Cf. Nardine*, ¶ 68 (holding that the prosecutor's misconduct warranted reversal because it was "particularly prejudicial" in a case that "depended almost entirely on the jurors' assessment of [the victim's] credibility, as there was no eyewitness or physical evidence to corroborate her claims"); *Walters*, 148 P.3d at 335 (Prosecutorial misconduct rarely requires reversal but may be warranted "when the evidence against a defendant is conflicting and inconclusive and the prosecutor continually appeals to the jurors' sentiments.").

## IV.   Conclusion

¶ 152    For all of the foregoing reasons, I would affirm the judgment of conviction.